IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

### CASE NO. 09-21871-CV-KING

JAMES A. BACON, KARL F. POPP,
and MARION BURK, individually and
on behalf of others similarly situated,

      Plaintiffs,

vs.

STIEFEL LABORATORIES, INC., a
Delaware corporation, CHARLES W.
STIEFEL, BRENT D. STIEFEL, TODD
STIEFEL, LODEWIJK DE VINK,
COMMITTEE MEMBER #1, COMMITTEE
MEMBER #2, COMMITTEE MEMBER
# 3, MATT S. PATULLO, TERRENCE N.
BOGUSH, and BOGUSH & GRADY, LLP.,
a New York Limited Liability Partnership,

      Defendants.

_____/

## ORDER GRANTING MOTIONS TO DISMISS IN PART

THIS CAUSE comes before the Court upon two motions to dismiss. One was filed by

Stiefel Laboratories, Inc., Charles W. Stiefel, Brent D. Stiefel, Todd Steiefel, Lodewijk de Vink,

Matt S. Pattullo, and the Committee Members (collectively, the "Stiefel Defendants") (DE #21),

and one was filed by Terrence N. Bogush and Bogush & Grady, LLP (collectively, the "Bogush

Defendants") (DE #25). After careful consideration and for the reasons detailed below, the

Court determines that both motions should be granted in part.

I.    **Factual Background**

The Complaint (DE #1) sets forth the following allegations. Plaintiffs are former

employees of defendant Stiefel Laboratories, Inc. ("the Company"). They were participants in the Employees' Stock Bonus Plan ("the Plan"), which allows employees to own stock in the Company and participate in its growth.[1] Under the original terms of the Plan, the participants could not sell, trade, or redeem their shares unless they separated from the company, at which time they had the right to "put" their shares to Company. That is, they had the right to demand that the Company purchase their shares, and the Company had a duty to buy them within a certain period of time.

The Plan is controlled and managed by a Committee, a Trustee, and a Plan Administrator. The Committee members and the Trustee are appointed by the Company's board of directors (the Trustee is currently defendant Charles W. Stiefel, the Company's CEO and chairman of the board), and the Plan Administrator is the Committee itself, although the Committee has delegated its duties as Plan Administrator to defendant Matt S. Pattullo. Under the terms of the Plan, it is the Trustee's responsibility to retain a qualified independent appraiser to determine the fair market value of the Plan stock. Those valuations have been performed by the Bogush Defendants.

Beginning in 2007, the Stiefel Defendants engaged in a series of actions that Plaintiffs claim amount to a scheme to force employees to sell their shares back to the Company at a below-market price, while simultaneously planning to sell the Company at a much higher price than was offered to Plaintiffs. For years, the Company has maintained its stance that it wishes to remain a family-controlled operation. Indeed, on March 8, 2007, an article appeared in the *Miami Herald* stating that the Company's CEO, Charles W. Stiefel, had said that the Company had no plans go public. However, things began to appear otherwise when, in August 2007, the

---

[1] A copy of the Plan is attached to the Complaint (DE #1).

Blackstone Group, an asset-management company that specializes in taking companies public, invested $500 million into the Company and received in return a new class of stock worth approximately $60,000 per share and a seat on the Company's board of directors. Nonetheless, another *Herald* article on August 10, 2007 reported that the Company stressed it had no plans to go public.

In fact, sometime in November 2008, the Company began to discuss with potential buyers the possible sale of the Company. Then, on November 21, 2008, the Company sent out its regular notice to Plan participants, reporting that the price of the stock—as calculated by an independent appraiser—was $16,469 per share. However, this communication also notified Plan participants that, as of January 1, 2009, the Plan was being terminated and merged into the Company 401(k) plan. Moreover, the communication stated that, for the first time in the Company's history, Plan participants were being given the option to "diversify" their Company shares by exercising a "put" option—that is, an option to sell their shares back to the Company at the current price. This option could only be exercised during February 2009.

On December 9, 2008, the Company terminated several of its employees, forcing them to exercise their "put" options immediately. On December 18, 2008, Plaintiff Popp elected to exercise the "put" option and sell his shares back to the Company at the reported price. The Company eventually purchased his shares during the February 2009 diversification window. On December 22, 2008, Charles Stiefel, the Company's CEO, met with the CEO of a potential buyer to discuss merger options. On that same date, the Company sent out another notice, reminding the Plan participants of their option to diversify.

During January 2009, Plaintiff Bacon elected to exercise the "put" option and sell his shares back to the Company at the reported price. As with Plaintiff Popp, the Company

eventually purchased his shares during the February 2009 diversification window. By January 2009, merger discussions had progressed to the point where five companies had indicated an interest in acquiring the Company. Indeed, in February 2009, the Company's management team met with managers from four or five other companies to discuss merger plans. On February 13, representatives from GlaxoSmithKline ("Glaxo"), a potential buyer, attended a Company presentation. On March 20, the *Wall Street Journal* reported that the Company was considering selling to a potential buyer for $3-4 billion. On March 24, Glaxo and another company submitted purchase bids to the Company. On April 17-19, the Company met with Glaxo to negotiate the final merger agreement, which was signed on April 20. Finally, on April 24, the Company notified its shareholders of the merger, in which Glaxo acquired the Company stock for $68,515.29 per share.

## II.    Discussion

Plaintiffs filed the Complaint in this case on July 7, 2009, asserting various causes of action. Count 1 alleges Breach of Fiduciary Duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*, against the Stiefel Defendants; Count 2 alleges Breach of Co-Fiduciary Duty under ERISA against the Stiefel Defendants; Count 3 alleges a prohibited transaction under ERISA against the Stiefel Defendants; Count 4 alleges securities fraud under the Securities and Exchange Act of 1934 and Rule 10b-5 against the Company and Charles W. Stiefel; Count 5 alleges a violation of the Florida Securities Act, Fla. Stat. § 517.301, against the Company and Charles W. Stiefel; Count 6 alleges accounting malpractice against the Bogush Defendants; and Count 7 alleges common law Breach of Fiduciary Duty against the defendants who are members of the Company board of directors. The Stiefel Defendants have collectively moved to dismiss Counts 1 through 5 and Count 7 (DE

4

#21), and the Bogush Defendants have moved to dismiss Count 6 (DE #25). The Court will address each argument in turn.

### A.    The Stiefel Defendants' Motion to Dismiss

#### 1.    Exhaustion of Administrative Remedies Under ERISA

The Stiefel Defendants first argue that all ERISA counts (Counts 1, 2, and 3) should be dismissed because Plaintiffs have failed to exhaust their administrative remedies. "The law is clear in this circuit that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997). However, district courts have discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate, *id.*, or where meaningful access to the administrative review process has been denied. *Perrino v. So. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000). The exhaustion requirement applies both to actions to enforce a statutory right under ERISA and to actions brought to recover benefits under a plan. *See Counts*, 111 F.3d at 109. Finally, a plaintiff must make a "clear and positive" showing of futility before the Court can excuse the exhaustion requirement. *Bickley v. Caremark Rx, Inc.*, 461 F.3d 1325, 1330 (11th Cir. 2006). Simply pleading that "all conditions precedent have been satisfied" or that all "such conditions have been waived or excused" is not sufficient to excuse exhaustion. *Variety Children's Hosp. v. Century Medical Health Plan*, 57 F.3d 1040, 1042 n. 2 (11th Cir. 1995).

In this vein, the Stiefel Defendants argue that the Plan provides for an appeal procedure whereby any Plan participant who has been denied a benefit under the Plan can submit a notice of appeal setting forth the reasons for disputing the Committee determination of benefits. *See* the Plan § 8.3. Therefore, they argue, Plaintiffs were required to utilize this process before filing this

lawsuit.  Plaintiffs make several arguments in response.  First, Plaintiffs argue that exhausting

their administrative remedies would be futile because the people who would be evaluating their

appeals—the Committee members—are the same people who they have accused of fraud and

have a conflict of interest in awarding Plaintiffs more benefits under the Plan.  However, this

argument has been specifically foreclosed by Eleventh Circuit precedent.  *See Lanfear v. Home

Depot, Inc.*, 536 F.3d 1217, 1225 (11th Cir. 2008) ("[T]he futility exception is about meaningful

access to administrative proceedings, not a potential conflict of interest of the decisionmakers.");

*Springer v. Wal-Mart Associates' Group Health Plan*, 908 F.2d 897, 901 (11th Cir. 1990)

(holding that asserting a conflict of interest or shared affiliation is insufficient as a matter of law

to establish futility); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1295 (S.D. Fla. 2003)

("[S]imple allegations of fraudulent conduct are not enough to invoke this [futility] exception.").[2]

Thus, Plaintiffs cannot claim futility based upon an alleged conflict of interests.  Second,

Plaintiffs argue that the appeals process is simply not designed to handle this kind of claim.  That

is, Plaintiffs argue, the appeals process exists specifically to remedy an erroneous denial of a

"claim for benefits," and Plaintiffs have not been denied a claim for benefits within the meaning

of that phrase as contemplated by the Plan.  However, this argument is equally unavailing, as the

Eleventh Circuit has interpreted this phrase broadly.  For instance, in *Lanfear* the court held that

a complaint for the decrease in value of a defined contribution account due to a breach of

fiduciary duty qualifies as a claim for benefits "because it is limited to the difference between the

---

[2] The Court notes, however, that Plaintiffs have presented a more compelling case for futility based upon a conflict of interest that has previously been presented. In previous cases, the alleged conflict was merely based on a shared desire to keep costs down or save the company money in general; here Plaintiffs allege that the defendants benefitted directly through the increased value of their stock.  That is, in this case money was going directly into the defendants' pockets, rather than to the company generally.  However, the Court is constrained by Eleventh Circuit precedent to conclude that Plaintiffs have not established futility on this ground.

benefits actually received and the benefits that would have been received if the plan management had fulfilled its statutory obligations." *Lanfear*, 536 F.3d at 1223. Similarly, Plaintiffs in the instant case are seeking what they see as their true "benefit" under the Plan: their correctly-valued shares of Company stock. Thus, the Court cannot excuse Plaintiffs' failure to exhaust their administrative remedies on this ground.

Plaintiffs' third argument is that using the appeals procedure would have been futile because the Committee does not have the power to re-value the stock, which is precisely the remedy they are seeking. That power, they argue, lies exclusively in the hands of the Trustee. When such a dispute arises, the proper course is for the Court to examine the terms of the Plan to determine if the Committee conceivably had the power to grant the remedy that Plaintiffs are seeking. *See, e.g., Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1226 (11th Cir. 1985). Section 9.4 of the Plan states the following with respect to the Committee's powers:

> The Committee shall have the power to construe, interpret, and apply the provision of the Plan, except to the extent that such power is otherwise specifically allocated to the Company, the Employers, or the Trustee under the Plan and Trust Agreement or allocated to other parties by operation of law. The Committee shall have the power to determine any questions of fact which arise under the Plan.

Moreover, section 9.9 states that "[t]he Committee shall perform all acts necessary to comply with ERISA." With respect to the powers of the Trustee, section 9.7 of the Plan states:

> The Trustee shall determine in its best judgment the fair market value of ESOP Stock and/or Bonus Stock from time to time as may be necessary for any purpose under the Plan, and shall obtain and be protected in relying upon whatever expert assistance my be required for its determination. However, if the ESOP Stock and/or Bonus Stock, as applicable, is not readily tradable on an established securities market, the Trustee shall retain an independent appraiser who meets requirements similar to those contained in regulations under section 170(a)(1) of the Code to make all valuations of ESOP Stock and/or Bonus Stock, as applicable, with respect to activities carried on by the Plan.

Based upon the above-quoted language, Plaintiffs argue that only the Trustee has the power to determine the value of the stock. Several courts have confronted similar situations. For instance, *In re United States Sugar*, 2009 U.S. Dist. LEXIS 82841 (S.D. Fla. April 28, 2009), involved a factual situation nearly identical to the instant case. The plaintiffs in *United States Sugar* were employees who accused their employer of purposefully undervaluing the price at which the employees could redeem their shares by failing to disclose a third-party offer to buy shares. *Id.* at *4. The plaintiffs argued that exhaustion of their administrative remedies would be futile because the committee to which they were appealing had no power to re-value the shares. *Id.* at *39. Judge Middlebrooks reviewed the text of the plan at issue and noted that it contained inconsistencies. That is, one provision stated that a trustee was responsible for determining the price of the shares, and another provision stated that the committee had the power to determine the price of the shares. *Id.* at *39-41. Reading both provisions together, Judge Middlebrooks concluded that the committee conceivably had the power to re-value the shares and therefore required the plaintiffs to pursue their administrative remedies. *Id.* at *47.

However, the key difference between *United States Sugar* and the instant case is that here the Plan is not inconsistent on this point. Although the Committee is vested with the very broad powers to "construe, interpret, and apply the provisions of the Plan" and to "perform all acts necessary to comply with ERISA," this power is expressly qualified by the phrase "except to the extent that such power is otherwise specifically allocated to the Company, the Employers, or the Trustee." Section 9.7 of the Plan then specifically allocates to the Trustee the power to determine the fair market value of the stock. When a general grant of power to the Committee is limited by the allocation of a specific power to the Trustee, the natural reading of these provisions is that the Committee does not have that specific power. This reading is also

consistent with principles of contractual and statutory interpretation. *See Universal Am. Mort. Co. v. Bateman*, 331 F.3d 821, 825 (11th Cir. 2003) (noting that when two provisions may conflict, "the more specific will control over the general"); *Alltel Communs., Inc. v. City of Macon*, 345 F.3d 1219, 1222 (11th Cir. 2003) ("[U]nder the doctrine *expressio unius est exclusio alterius*, the expression of one thing implies the exclusion of others.").

Moreover, two seemingly on point Eleventh Circuit cases are actually distinguishable for the same reason. In *Bickley*, the court confronted a plan with broad language, giving the plan administrator the "exclusive responsibility and complete discretionary authority" to manage the plan operations, and all the power necessary to resolve any disputes that may arise with respect to the plan. 461 F.3d at 1329. The court concluded that, despite the fact that the plan did not specifically give the committee the power to grant the remedy that the plaintiffs were seeking, the broad language provided sufficient discretionary authority to the plan administrator such that the plaintiffs were required to pursue their administrative remedies before filing suit. *Id.* at 1329-30. Similarly, the *Lanfear* court, following *Bickley*, held that nearly identical plan language provided sufficient discretionary authority to require the plaintiffs to exhaust their administrative remedies. 536 F.3d at 1224. However, in neither of those cases was there a separate provision giving to a separate entity the power to provide the plaintiffs with the exact remedy that they were seeking. Conversely, in the instant case Plaintiffs are seeking a re-valuation of their shares, a power that is solely the hands of the Trustee. Therefore, a resort to the administrative appeals process would be futile because the Committee does not have the power to remedy Plaintiffs' perceived harm. As such, the Court will exercise its discretion and excuse Plaintiffs' failure to exhaust their administrative remedies, and therefore the ERISA counts should not be dismissed on this basis.

## 2.    The Company as a Fiduciary of the Plan

The Stiefel Defendants' next argument is that all ERISA counts against the Company should be dismissed because Plaintiffs have not properly alleged that the Company is a fiduciary of the Plan. "To establish liability for a breach of fiduciary duty under any of the provisions of ERISA § 502(a), a plaintiff must first show that the defendant is in fact a fiduciary with respect to the plan." *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005). ERISA provides that a person can become a fiduciary in one of two ways: 1) Being a "named fiduciary" in the Plan instrument, 29 U.S.C. § 1102(a)(2); or 2) exercising discretionary control over the Plan or the management of its assets, rendering investment advice for a fee, or having any discretionary authority or responsibility over Plan administration. 29 U.S.C. § 1002(21)(A). The Stiefel Defendants argue that Plaintiffs have failed to allege either that the Company is a named fiduciary or any facts showing that that it exercised discretionary control.

First, Plaintiffs have not alleged that the Company is a named fiduciary of the Plan.[3] Second, the only allegation with respect to discretionary authority is contained in paragraph 35 of the Complaint, which states that the Company was a fiduciary "because [it] had, without limitation, the authority to name and retain the Employee Plan's Trustee, the Committee and Plan Administrator, and [it] exercised discretion, authority or discretionary control respecting the management, administration or disposition of assets of the Employee Plan." Because Plaintiffs allege no other facts in this regard, this issue is squarely controlled by the Eleventh Circuit's decision in *Cotton*, 402 F.3d at 1277-78. In *Cotton*, the court held that when a plaintiff merely

---

[3] In their Response to the Stiefel Defendants' Motion to Dismiss (DE #37), Plaintiffs claim that, in a form submitted to the IRS, the Company listed itself as the Plan Administrator, which is a fiduciary under ERISA. However, this contradicts both the Complaint and the Plan itself. Paragraph 33 of the Complaint and section 9.1 of the Plan both state that the Committee was the Plan Administrator.

"recites portions of the statutory definition" of an ERISA fiduciary without pleading any other facts, the complaint fails to sufficiently allege fiduciary status. *Id.* at 1277. Here, that is precisely what the Complaint does—it merely tracks the statutory language defining an ERISA fiduciary, but provides no facts to support the conclusory allegations. Therefore, because the Complaint fails to properly allege that the Company is an ERISA fiduciary of the Plan, all ERISA claims against the Company only are hereby dismissed without prejudice.

### 3.    Plaintiffs' Standing to Assert a Prohibited Transaction Under ERISA

The Stiefel Defendants' next argument is that Plaintiffs lack standing to assert Count 3, which alleges that the defendants engaged in a transaction that is prohibited by ERISA, 29 U.S.C. § 1106(a)(1)(A). Plaintiffs concede that the three named plaintiffs lack standing because they did not engage in the subject transaction, and state that they will amend their Complaint to include plaintiffs who have standing to assert this claim. Accordingly, Count 3 is dismissed without prejudice.

### 4.    Failure to State a Federal Securities Law Claim

The Stiefel Defendants' next argument is that Count 4, alleging a violation of the federal securities laws against the Company and Charles W. Stiefel, should be dismissed for failure to state a claim. Boiled down to its essence, Plaintiffs' federal securities claim is that the Company and Charles Stiefel reported the stock price to the Plan participants while knowing that merger discussions were taking place and therefore knowing that the stock was actually worth much more than was reported.

Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful for any person, directly or indirectly, "[t]o

use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To state a securities fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must establish the following elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the missstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).

Moreover, since this is a claim for fraud, Plaintiffs must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires the circumstances constituting fraud to be pled with particularity. In addition, Plaintiffs must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which was passed for the purpose of "curbing abusive securities litigation" by "permit[ting] the dismissal of frivolous cases at the earliest feasible stage of the litigation, thereby reducing the cost to the company, and by derivation, to its shareholders, in defending a baseless action." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999). The PSLRA therefore raised the pleading standard for securities fraud cases in two significant ways:

> [First], the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> . . . [Second], the complaint shall, with respect to each act or omission alleged to
> violate this title, state with particularity facts giving rise to a strong inference that
> the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1) &
> (2).

In the Eleventh Circuit, the scienter, or state of mind, requirement is "severe recklessness,"
which is characterized as follows: "Severe recklessness is limited to those highly unreasonable
omissions or misrepresentations that involve not merely simple or even inexcusable negligence,
but an extreme departure from the standards of ordinary care, and that present a danger of
misleading buyers or sellers which is either known to the defendant or is so obvious that the
defendant must have been aware of it." *Bryant*, 187 F.3d at 1282 n. 18 (quoting *McDonald v.
Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989)). Moreover, a "strong inference"
under the PSLRA is an inference that is "at least as likely as any plausible opposing inference."
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 329 (2007). *See also Mizzaro*, 544
F.3d at 1238-39 ("In sum, the reviewing court must ask: When the allegations are accepted as
true and taken collectively, would a reasonable person deem the inference of scienter at least as
strong as any opposing inference?"). Finally, the Court should consider the entirety of the
Complaint in determining whether Plaintiffs have established the scienter requirement. *See In re
Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1165 (S.D. Fla. 2004).

With these principles in mind, the defendants make two sub-arguments for why Count 4
fails to state a claim. The first is that the Company's representations were neither misleading nor
material. As to the misleading element, the Stiefel Defendants point to the oft-quoted statement
from the Supreme Court that "[s]ilence, absent a duty to disclose, is not misleading under Rule
10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988). Indeed, several courts have held
that, generally, a corporation has no duty to disclose the existence of merger discussions. *See
Williams v. Dresser Indus.*, 120 F.3d 1163, 1174 (11th Cir. 1997) ("In the context of sales of

stock while negotiations for merger or acquisitions were pending, courts have found no duty to disclose the negotiations."); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 616 (4th Cir. 1999) (statement that "we're not a company that's for sale" was not misleading where company did not actively deny the existence of merger discussions); *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("We agree that the mere fact that exploration of merger or LBO possibilities may have reached a stage where that information may be considered material does not, of itself, mean that the companies have a duty to disclose."); *Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 488 (S.D.N.Y. 2009) ("Here, where the company said nothing about the possibility of being acquired, the failure to disclose discussions concerning a possible merger did not mislead shareholders one way or the other."). However, where a defendant does make voluntary statements, "it must speak completely to avoid 'half-truths.'" *In re Miller Indus. Sec. Litig.*, 120 F. Supp. 2d 1371, 1378 (N.D. Ga. 2000) (quoting *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977)). Indeed, in the Eleventh Circuit, "'[a] duty to disclose may . . . be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises.'" *Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1268 (11th Cir. 1998) (quoting *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir.1986)); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) ("This Court has recognized that a duty to disclose arises not only where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, but also where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case.") (quotations and citations omitted).

Here, Plaintiffs have alleged that, in November and December of 2008, the Company sent

communications to Plaintiffs, informing them of the price of their stock, and notifying them of their limited-time offer to exercise a "put" option at that price. Plaintiffs have also alleged that, at the same time, the Company was actively engaged in merger discussions. Thus, the Company's statement of reporting the stock price created a duty to disclose any information that would make that statement not misleading. In this case, the price of the stock, by itself, was misleading because the Company knew that the merger would have likely increased the price of the stock, making the reported price incorrect. In short, although the Company had no generalized duty to disclose the merger discussions, the Company's communication of the stock price created a duty to disclose either the existence of the discussions or some other information that would have alerted Plaintiffs to the increased value of their stock.

The case of *Smith v. Duff & Phelps, Inc.*, 891 F.2d 1567 (11th Cir. 1990), which involved facts very similar to those of the instant case, is instructive on this point.[4] In *Smith*, the plaintiff was an employee and stockholder of the defendant company. *Id.* at 1568. Just before retirement, the plaintiff exercised a contractual option to sell back his shares to the company at the agreed upon price, which was the adjusted book value of the stock. *Id.* At the same time, however, the company failed to inform him that it was engaged in negotiations for the sale of the company for a much higher share price. *Id.* The court held that, where an employee has control over an event that triggers a repurchase agreement (such as retiring or exercising a "put" option), the company must disclose "any material facts which [a company] would have had to disclose in the absence of the stock repurchase agreements." *Id.* at 1574. The opinion strongly implied, but did not expressly hold, that the failure to disclose the purchase discussions and the negotiated purchase

---

[4] The Court is aware that *Smith* is a pre-PSLRA case. However, *Smith* was an appeal from a grant of summary judgment, whereas the PSLRA imposes pleading requirements that apply on a motion to dismiss, and does not change the substantive standard of liability. Moreover, the Court treats *Smith* as merely instructive, and not binding, precedent.

price violated the employee's right to have all material information. *Id.* ("When an employee investor chooses to leave the enterprise, the securities laws mandate that he be provided any information material to the exercise of that choice. . . . In fact, it seems that the only reason a closely-held corporation would be reluctant to disclose merger information to potential retirees who hold its stock is its fear that if the retirees knew of the possible merger, they would wait to retire until they could get the largest return, thus depriving the majority shareholders of larger profits."). The same considerations are present in the instant case, as Plaintiffs have accused the Company of encouraging them to sell their stock back to the Company at a specified price while knowing that ongoing merger discussions were going to result in an increased share value. Thus, the defendants' statements, as Plaintiffs have alleged and if proven at trial, were misleading.

Furthermore, the omissions, if the allegations are proven at trial, were material. The Supreme Court has defined materiality as follows: "[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic*, 485 U.S. at 231-32 (quotations and citations omitted). Moreover, "materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 238. The Supreme Court has suggested that courts examine several factors to make this determination, including board resolutions, instructions to investment bankers, and actual negotiations that have taken place. *Id.* at 239. To assess the magnitude of the event, courts should consider factors such as the size of the two corporate entities and of the potential premiums over market value. *Id.* No particular event or factor short

of closing the transaction should be considered dispositive. *Id.*

However, as the Stiefel Defendants concede, materiality "is a question of fact that may rarely be resolved at the motion to dismiss stage." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1364 (S.D. Fla. 2001). Indeed, "'[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.'" *Id.* (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1996)). Nonetheless, the Stiefel Defendants argue that the merger discussions were unquestionably immaterial because they were too preliminary and speculative. The Court disagrees. A reasonable stockholder, when given the one-time opportunity to cash in his or her shares while still keeping employment with the Company, would have wanted to know that the Company was in merger discussions because of the significant possibility that the value of the shares was actually much higher than was reported. Such a stockholder would almost certainly reconsider exercising the "put" option because of the fact that the stock would be worth much more in less than a year's time. The magnitude of such an event is great, as the Company had remained family controlled for such a long time and the premium available to the shareholders was nearly five times greater than the current stock price. Moreover, the cases cited by the Stiefel Defendants stand for the proposition that preliminary merger discussions are not material absent a duty to disclose them. As discussed above, however, the Company created a duty to disclose when it reported an under-valued stock price and gave Plaintiffs a one-time offer to sell their shares back to the Company at that price. At that point, the merger discussions became material.

The second sub-argument that the Stiefel Defendants make is that Plaintiffs generally

have not plead sufficient facts to create the requisite strong inference of scienter. As stated above, the scienter requirement for a federal securities fraud claim is "severe recklessness," which involves an omission that presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. A "strong inference" is one that is at least as likely as any plausible opposing inference. Plaintiffs have met that burden here. Plaintiffs have alleged that the Company notified Plaintiffs of the value of their stock and encouraged them to sell their shares back to the Company at that price, while at the same time the Company knew that merger discussions were taking place which would have actually made the price of the shares much higher. Thus, the allegations show that the defendants were severely reckless with respect to the falsity of the stock price because they either knew the true value was much higher, or, if they did not "know," the danger that the price was false was so obvious that they must have known, as it would be obvious to anyone that a merger with GlaxoSmithKline (after a $500 million infusion of capital from Blackstone) would significantly increase the price of the stock. Moreover, the allegations create a strong inference of severe recklessness, as there is no plausible opposing inference, and the defendants have put forth none.[5] Reading the Complaint in its entirety, the allegations strongly imply that the defendants acted with the requisite state of mind. Thus, Plaintiffs have stated a claim under the federal securities laws and the motion to dismiss Count 4 is therefore denied.

### 5.    ERISA Preemption of the Florida Securities Act Claim

The Stiefel Defendants' next argument is that all state law claims are preempted by

---

[5] One theoretical explanation, which the Stiefel Defendants have not asserted, is that the Company simply repeated the price of the stock that was reported to it by the independent appraiser, the Bogush Defendants. However, even if this were the case, the Company still had a duty to correct the misleading stock price by disclosing the existence of the merger discussions. This explanation also does not negate the strong inference that the defendants knew the stock price was misleading when reported.

ERISA. The Court will first address preemption of Count 5, the Florida Securities Act (FSA) claim.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).[6] This broad provision is then tempered by the Savings Clause, which provides that "nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). These provisions have been the subject of extensive judicial interpretation, due in part to the "unhelpful text and the frustrating difficulty of defining [the] key terms." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995). Indeed, the clauses "perhaps are not a model of legislative drafting," *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985), and "the legislative history of these provisions is sparse." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 99 (1993).

However, for the FSA claim, the Court need not delve into the specific issue of interpreting these two provisions. That is, the parties agree that the FSA is a law that "relates to an employee benefit plan," and they further agree that it is a "law which regulates . . . securities." 29 U.S.C. § 1144. Thus, ordinarily, this claim would not be preempted by ERISA. Nonetheless, the Stiefel Defendants argue that, apart from ERISA's express preemption clause, the FSA claim is *impliedly* preempted by ERISA's extensive civil enforcement scheme. The Supreme Court has alluded to this type of preemption, but has provided little guidance in terms of its scope. In *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987), the Supreme Court first encountered this issue by noting that the "detailed provisions of § 502(a) set forth a comprehensive civil enforcement

---

[6] "State law" is defined as including "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1).

scheme." *Id.* at 54.[7]   The Court then concluded that "ERISA's civil enforcement remedies were intended to be exclusive," and strongly suggested that any state law that provided a remedy which Congress specifically rejected in ERISA would be impliedly preempted. *Id.* (holding that state laws authorizing actions for monetary damages for consequential emotional distress are preempted).   The Court then appeared to recede from this position somewhat in *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358 (1999).   In *UNUM*, the Court was presented with the opportunity to declare that any state law that attempted to supplant ERSIA's civil enforcement scheme, regardless of the Savings Clause, was impliedly preempted.   However, the Court declined to go that far, and expressly left the issue open. *Id.* at 377 n.7.

The Supreme Court then confronted the issue head on in *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002).   In *Rush*, the Court acknowledged the type of implied preemption that the Stiefel Defendants argue for here, noting that, even if a state law is "saved" from preemption by the Savings Clause, it may nonetheless still be preempted if it conflicts with the

---

[7] ERISA § 502(a) provides, in relevant part: "(a) Persons empowered to bring a civil action. A civil action may be brought--

(1) by a participant or beneficiary--

   (A) for the relief provided for in subsection (c) of this section, or

   (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [29 USCS § 1109];

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 105(c) [29 USCS § 1025(c)];

(5) except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this title, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this title;

(6) by the Secretary to collect any civil penalty under paragraph (2), (4), (5), (6), (7), (8), or (9) of subsection (c) or under subsection (i) or (l)." 29 U.S.C. § 1132(a).

congressional policy of providing "exclusively federal remedies." *Id.* at 377. Indeed, the Court characterized *Pilot Life* as holding that any law that "provided a form of ultimate relief in a judicial forum that added to the judicial remedies provided by ERISA" is preempted. *Id.* at 379. However, the Court declined to adopt the petitioner's expansive view of implied preemption, and held that a state law providing a right to an independent medical review of a denial of benefits was not preempted because it did "not enlarge the claim beyond the benefits available in any action brought under [ERISA]," and "the relief ultimately available would still be what ERISA authorize[d] in a suit for benefits under § 1132(a)." *Id.* at 379-80. Finally, the Supreme Court seemed to expand the scope of implied preemption in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), with the categorical statement that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* at 209.[8]

Taking these cases together, it seems that *Aetna Health* states that general rule that any cause of action that duplicates, supplements, or supplants the ERISA civil enforcement scheme or its remedies is preempted. *See, e.g., Herman v. Metro. Life Ins. Co.*, 2008 U.S. Dist. LEXIS 101612, *8 (M.D. Fla. Dec. 16, 2008) (quoting the above statement from *Aetna Health*). However, as indicated in *Rush*, a law is not preempted if it merely creates other procedural rights (such as the right to an independent medical review), but does not conflict with ERISA's remedies or provide for greater remedies than those authorized by ERISA. Indeed, several cases have utilized similar reasoning, indicating that a court must examine the remedy provided by the

---

[8] *Aetna Health* involved "complete" or jurisdictional preemption, whereas the instant case involves "defensive" preemption. However, the analyses are very similar for the purposes of this case, and *Aetna Health* is instructive nonetheless.

state cause of action. *See Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1268 (11th Cir. 2004) ("Moreover, once rights and responsibilities under ERISA are invoked, overlapping state law claims are necessarily preempted since they may conflict with ERISA's elaborate system of employee protections."); *Singh v. Prudential Health Care Plan, Inc.*, 335 F.3d 278, 288-89 (4th Cir. 2003) (holding that Maryland HMO Act's subrogation prohibition provision was not preempted because it did "not depend on any particular remedy but operates simply to define the scope of a benefit provided to members of HMOs in Maryland—i.e., entitlement to retain their full benefit and not have it reduced by recoveries from third parties."); *Corporate Health Ins., Inc. v. Texas Dept. of Ins.*, 215 F.3d 526, 539 (5th Cir. 2000) ("The saving clause does not operate if the state law at issue creates an alternative remedy for obtaining benefits under an ERISA plan."); *Parra v. John Alden Life Ins. Co.*, 22 F. Supp. 2d 1360, 1364-1365 (S.D. Fla. 1998) ("The Court's task, therefore, is not only to look at the state law that Plaintiff is employing, but also, and more importantly, evaluate the remedy that Plaintiff is seeking. Because the remedy that Plaintiff seeks is the recovery of plan benefits, and because this remedy can be obtained solely through section 502(a) of ERISA, Plaintiff cannot proceed under state law."); *Oiknine v. United Healthcare of Fla., Inc.*, 2003 U.S. Dist. LEXIS 26468, *2 (M.D. Fla. June 17, 2003) ("The civil enforcement provisions of ERISA provide the exclusive remedy available to recover benefits due under employee welfare benefit plans."); *Harrelson v. Blue Cross & Blue Shield of Ala.*, 150 F. Supp. 2d 1290, 1295 (M.D. Ala. 2001) ("Plaintiff's bad faith claim conflicts with ERISA's civil enforcement provision, § 1132(a), by creating an alternative remedy for obtaining benefits under an ERISA plan. Thus, as already stated, Plaintiff's bad faith claim is completely preempted."); *Bonnell v. Bank of Am.*, 284 F. Supp. 2d 1284, 1288 (D. Kan. 2003) ("Therefore, a state law is preempted if it adds to the judicial remedies available under ERISA.").

Thus, the Court must examine the remedy sought by Plaintiffs.   Under this count, Plaintiffs' claim is created by the Florida Securities Act (FSA), which provides a cause of action for damages incurred in connection with the purchase or sale of a security in violation of the substantive portions of the FSA.  Fla. Stat. § 517.211.  The remedy for this type of action by a seller of securities is that the plaintiff may "recover an amount equal to the difference between (a) the value of the security at the time of the complaint, plus the amount of any income received by the defendant on the security; and (b) the consideration received for the security, plus interest at the legal rate from the date of sale."  Fla. Stat. § 517.211(5).  In essence, Plaintiffs' remedy under this section is the difference between the true value of the stock and the amount Plaintiffs received for it.  Hence, the FSA does more than create a procedural right; it provides a remedy of monetary damages that supplements the remedies provided by ERISA.  In fact, the FSA remedy also duplicates the ERISA remedy because ERISA's chief remedy is a suit for benefits.  In this case, Plaintiffs argue that their true benefit is the actual fair market value of their shares. Therefore, their "claim for benefits" is a claim for the difference between the true value of their shares and what they received for them—the exact remedy provided by the FSA.  When the remedy Plaintiffs are seeking is a recovery of plan benefits, they must proceed under ERISA, because the FSA cause of action is impliedly preempted by ERISA's extensive civil enforcement scheme.  Accordingly, Count 5 is dismissed without prejudice.

### 6.    ERISA Preemption of the Common Law Breach of Fiduciary Duty Claim

The Stiefel Defendants also argue that Count 7, Breach of Common Law Corporate Fiduciary Duty, should be dismissed because it is preempted by ERISA.  Unlike the above discussion, this argument does not involve implied preemption, but rather the express preemption contained in the ERISA text.  *See* 29 U.S.C. § 1144(a) (ERISA preempts "any and all State laws

insofar as they may now or hereafter relate to any employee benefit plan."). Thus, the Court must determine whether this claim for breach of corporate fiduciary duty "relates to" an employee benefit plan.

The Supreme Court has broadly interpreted the "relate to" language of Section 1144(a) as encompassing any state law that has a "connection with or reference to" employee benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983). However, "[b]ecause the 'relate to' test is of limited utility, [the Court] must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1180 (11th Cir. 2006) (quotations and citations omitted). Despite this difficulty, several points of guidance have emerged. For instance, ERISA preempts all state laws insofar as they apply to employee benefit plans "even if those laws do not expressly concern employee benefit plans and amount only to indirect regulation of such plans." *Howard v. Parisian, Inc.*, 807 F.2d 1560, 1564 (11th Cir. 1987). In fact, a mere "nexus with the ERISA plan and its benefits system" is all that is required for preemption. *Variety Children's Hosp. v. Century Medical Health Plan*, 57 F.3d 1040, 1042 (11th Cir. 1995). However, the mere existence of an ERISA plan is not enough for preemption. *Forbus v. Sears Roebuck & Co.*, 30 F.3d 1402, 1404 (11th Cir. 1994). "Rather, the state law in question must make reference to or function with respect to the ERISA plan in order for preemption to occur." *Id.* Indeed, a state law should not be preempted "when the law has too tenuous a connection with the ERISA plan." *Morstein v. Nat'l Ins. Svcs., Inc.*, 93 F.3d 715, 722 (11th Cir. 1996) (en banc).

With these principles in mind, the Court now turns the specific issue of whether this common law claim for breach of corporate fiduciary "relates to" an ERISA plan. At the outset, it

24

seems clear that, in general, a claim for breach of corporate fiduciary duty is not preempted merely because the two parties are ERISA entities. *See Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1016 (11th Cir. 2003) (holding that a breach of corporate fiduciary claim is not preempted where the claim was "premised on the parties' roles of majority and minority shareholders" rather than their "traditional ERISA roles" and the claim did "not seek compensatory relief 'akin to' that available under [ERISA]"). Here, however, the Stiefel Defendants argue that these Plaintiffs' particular claim should be preempted because the rights they seek to enforce (and the corresponding remedy) only exist because of the Plan. That is, the right to sell shares back to the Company at fair market value is a right that was provided only to Plan participants, and no other category of shareholder had the right to force the Company to buy back his or her shares at fair market value as determined by an independent appraiser. Thus, the Company's alleged failure to determine the fair market value of the stock is a failure to abide by the terms of the Plan. In short, the defendants argue, if the Plan did not exist, Plaintiffs would have no cause of action for breach of corporate fiduciary duty.

At least two Eleventh Circuit cases have addressed similar issues. In *Sanson v. General Motors Corp.*, 966 F.2d 618 (11th Cir. 1992), the plaintiff claimed that General Motors (GM) fraudulently represented to him that the benefits under a special retirement program would not be offered to him. *Id.* at 619. Relying on that representation, the plaintiff retired early, opting to take the standard benefits package. *Id.* Shortly after his retirement, GM offered the special benefits package to employees similar to the plaintiff. *Id.* The plaintiff sued, claiming that GM fraudulently induced him to retire early to avoid paying him the special benefits package. *Id.* The court held that such a claim was preempted because the ERISA plan was "critical in establishing liability," GM's misrepresentation related to the plaintiff's retirement benefits

available under the ERISA plan, and the measure of damages would be the amount of benefits the plaintiff would have received under the retirement plan. *Id.* at 621. Two years later, in *Forbus v. Sears Roebuck & Co.*, 30 F.3d 1402 (11th Cir. 1994), the Eleventh Circuit confronted nearly identical facts and reached the opposite conclusion. In *Forbus*, the plaintiffs claimed that Sears misrepresented to them that the facility where they worked was closing, and that they could either be fired without benefits, or involuntarily "resign" and receive the benefits package. *Id.* at 1403-04. The plaintiffs elected to resign, but subsequently learned that the facility was being kept open and younger workers were hired to replace them. *Id.* at 1404. They sued, claiming that Sears had fraudulently induced them into resigning. *Id.* The court distinguished *Sanson* by noting that the misrepresentation in *Sanson* was about the benefits that were available under an ERISA plan, whereas in *Forbus* the "alleged misrepresentation did not involve a benefit plan—it involved the very existence of the plaintiffs' jobs." *Id.* at 1406. Thus, the existence of the ERISA plan was not critical to the cause of action, and therefore the claim was not preempted.[9] *Id.*

The instant case is more like *Sanson* than *Forbus*, in that the Plan is critical to Plaintiffs' cause of action. Plaintiffs do not claim that the Company directors breached an independent common law duty to act as fiduciaries with respect to the shareholders, they claim that the directors interfered with their right to "put" their shares to the Company at "fair market value"— a right that was defined by and only existed because of the Plan. The Stiefel Defendants are correct in noting that the Company's alleged failure to accurately determine the fair market value of the stock is merely a failure to abide by the terms of the Plan. Although the calculation of

---

[9] The court also noted that "the mere fact that the plaintiffs' damages may be affected by a calculation of pension benefits is not sufficient to warrant preemption." *Forbus*, 30 F.3d at 1406-07.

Plaintiffs' damages would necessarily be determined by referencing the Plan, and that alone is not enough to preempt a state law, this case involves much more than that. The Plan is critical to Plaintiffs' claim because if the Plan did not exist, Plaintiffs would have no cause of action for breach of corporate fiduciary duty. In fact, one district court has already reached that conclusion. In *Morrison v. Burt*, 1995 U.S. Dist. LEXIS 9065 (S.D. Ala. June 29, 1995), the plaintiffs claimed that they were fraudulently induced to vote for an ERISA stock plan which was different from the one they thought they were enacting. *Id.* at *9. Relying on *Sanson* and *Forbus*, the court held that the claim for breach of corporate fiduciary duty was preempted because the plan was critical to the cause of action, as the claim went "directly to the creation and validity of the [ERISA stock plan]." *Id.* at *12. *See also Eckelkamp v. Beste*, 315 F.3d 863, 870 (8th Cir. 2002) (state law breach of corporate fiduciary duty preempted by ERISA). Therefore, the Court concludes that Plaintiffs' claim for common law breach of corporate fiduciary duty is preempted by ERISA.

Plaintiffs argue that *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1470 (5th Cir. 1986), requires a contrary conclusion. However, *Sommers* is inapposite. *Sommers* held that a claim for breach of corporate fiduciary duty was not preempted when the plaintiffs merely invoked rights that arose solely from their status as shareholders, and sought to enforce duties that arose solely from the defendants' status as directors. *Id.* at 1470. As noted above, that is not the case here. Here, the rights, duties, and remedies that Plaintiffs seek to enforce exist solely because of the Plan. Without the Plan, there would be no cause of action. Thus, *Sommers* does not compel the conclusion that Plaintiffs seek.[10] Count 7 is therefore dismissed without prejudice.

---

[10] Moreover, *Sommers* is not from the Eleventh Circuit and preceded both *Sanson* and *Forbus*.

7.   **Failure to State a Claim Under the FSA or Common Law Breach of Fiduciary Duty**

Defendants argue that Plaintiffs have failed to state a claim under the Florida Securities Act or for common law breach of fiduciary duty. Because the Court has determined that both of these claims are preempted, the Court declines to address these arguments.

B.   **The Bogush Defendants' Motion to Dismiss**

Plaintiffs, in Count 6, allege a claim for professional malpractice against the Bogush Defendants, the accountants who were responsible for determining the fair market value of the stock. In their motion to dismiss, the Bogush Defendants make two arguments: 1) Plaintiffs have failed to state a claim for accounting malpractice, and 2) Plaintiffs' claim is preempted by ERISA.

1.   **Failure to State a Claim for Accounting Malpractice**

The Bogush Defendants' first argument is the Plaintiffs have failed to state a claim for malpractice. The Florida Supreme Court has adopted the Second Restatement's view of an accountant's liability to a third party. *First Florida Bank, N.A. v. Max Mitchell & Co.*, 558 So. 2d 9, 15 (Fla. 1990). That provision provides as follows:

> Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance [the accountant] intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that [the accountant] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction. Restat. 2d of Torts, § 552(2) (1976).

The Bogush Defendants argue that Plaintiffs have not plead sufficient facts to satisfy the first prong of the test. Indeed, the only allegation as to the accountants' knowledge of the people

28

who would rely on the valuations is paragraph 173 of the Complaint: "Bogush and B&G knew that the Plaintiffs, as Employee Plan participants, relied upon their valuation of Company Stock in making the decision as to whether and when to put their stock to the Company under the Employee Plan." This conclusory language contains no facts showing *how* the Bogush Defendants knew that Plaintiffs were part of a limited group of people who were going to rely on the valuations. *See Herons Cove Enterprises, LLC v. Epic Consulting, Inc.*, 2008 WL 2915066, *4-5 (M.D. Fla. July 25, 2008) (general allegations insufficient where plaintiff failed to plead specific facts showing how defendant knew plaintiff was going to rely on reports); *Machata v. Seidman & Seidman*, 644 So. 2d 114, 116 (Fla. 4th DCA 1994). Therefore, Count 6 is dismissed without prejudice for failure to state a claim.

### 2. ERISA Preemption of Accounting Malpractice Claim

The Bogush Defendants also argue that the accounting malpractice claim is preempted by ERISA. Because the Court has determined that this count fails to state a claim, the Court declines to address this argument.

### III. Conclusion

Accordingly, after careful consideration and the Court being otherwise fully advised, it is **ORDERED, ADJUDGED, and DECREED** that:

1. The Stiefel Defendants' Motion to Dismiss (DE #21) is hereby **GRANTED in PART**: Counts 1 (Breach of Fiduciary Duty under ERISA) and 2 (Breach of Co-Fiduciary Duty under ERISA) are **DISMISSED WITHOUT PREJUDICE against Stiefel Laboratories, Inc. ("the Company") only.** Counts 3 (Prohibited Transaction under ERISA), 5 (Florida Securities Act), and 7 (Common Law Breach of Corporate Fiduciary Duty) are **DISMISSED WITHOUT**

**PREJUDICE against all defendants.** Thus, the remaining claims are Count 4 (Federal Securities Laws) against all defendants named therein, and Counts 1 and 2 against all defendants named therein except the Company.

2.  The Bogush Defendants' Motion to Dismiss (DE #25) is hereby **GRANTED.** Count 6 (Accounting Malpractice) is **DISMISSED WITHOUT PREJUDICE.**

3.  The Motion for Hearing (DE #22) is **DENIED.**

4.  If Plaintiffs wish to file an Amended Complaint, Plaintiffs shall do so **within 30 days from the date of this Order.**

**DONE AND ORDERED** in Chambers, at Miami, Miami-Dade County, Florida, this 4th day of January, 2010.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

Cc:
**Counsel for Plaintiffs**
Beth-Ann Ellenberg Krimsky
Ruden McClosky Smith Schuster & Russell
200 E Broward Boulevard
15th Floor PO Box 1900
Fort Lauderdale, FL 33302-1900
954-764-6660
Fax: 333-4027
Email: beth-ann.krimsky@ruden.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Jennifer Nichols Walker
Ruden McClosky Smith Schuster & Russell
200 E Broward Boulevard

15th Floor PO Box 1900
Fort Lauderdale, FL 33302-1900
954-527-6272
Fax: 333-4272
Email: jennifer.walker@ruden.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Norman S. Segall
Ruden McClosky Smith Schuster & Russell
701 Brickell Avenue
Suite 1900
Miami, FL 33131
305-789-2755
Fax: 537-3955
Email: norman.segall@ruden.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

John Rush Keller
Ruden McClosky Smith Schuster & Russell
200 E Broward Boulevard
15th Floor PO Box 1900
Fort Lauderdale, FL 33302-1900
954-764-6660
Fax: 764-4996
Email: john.keller@ruden.com
ATTORNEY TO BE NOTICED

**Counsel for Defendants**
David A. Coulson
Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131
305-579-0500
Fax: 305-579-0717
Email: coulsond@gtlaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Hilarie Bass
Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131
305-579-0745
Fax: 579-0717

Email: bassh@gtlaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Mercer Kaye Clarke
Clarke Silverglate & Campbell, P.A.
799 Brickell Plaza
9th Floor
Miami, FL 33131
305-377-0700
Fax: 377-3001
Email: bclarke@csclawfirm.com
TERMINATED: 09/16/2009
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Sandra Jessica Millor
Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131
305-579-0774
Fax: 305-579-0717
Email: millors@gtlaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Todd D. Wozniak
Greenberg Traurig
3290 Northside Parkway
The Forum Suite 400
Atlanta, GA 30327
678-553-2100
Fax: 678-553-2212
Email: wozniakt@gtlaw.com
PRO HAC VICE
ATTORNEY TO BE NOTICED