IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JAMES A. BACON, MARK PALAKOVICH,
and MARION BURK, individually
and on behalf of others similarly
situated,

                    Plaintiffs,

vs.                                                   Civil Action No. 09-21871-CV-KING

STIEFEL LABORATORIES, INC., a
Delaware corporation, CHARLES W.
STIEFEL, BRENT D. STIEFEL, TODD
STIEFEL, LODEWIJK DE VINK,
STEVE KARASICK, MICHAEL CORNELIUS
MATT S. PATTULLO, TERENCE N. BOGUSH, CPA,
and BOGUSH & GRADY, LLP, a New York
Limited Liability Partnership.

                    Defendants.
_____/

## AMENDED COMPLAINT- CLASS ACTION

Plaintiffs, JAMES A. BACON, MARK PALAKOVICH and MARION BURK,

individually and on behalf of all current and former participants of the Stiefel Laboratories, Inc.

Employee Stock Ownership Plan and Trust (the "Employee Plan")(collectively "Plaintiffs"),

bring this action against STIEFEL LABORATORIES, INC., a Delaware corporation, CHARLES

W. STIEFEL, BRENT D. STIEFEL, TODD STIEFEL, LODEWIJK DE VINK, STEVE

KARASICK, MICHAEL CORNELIUS, MATT S. PATTULO, TERENCE N. BOGUSH, CPA,

and BOGUSH & GRADY, LLP, a New York Limited Liability Partnership, and allege:

### NATURE OF THE ACTION

1.      This is an action brought by Plaintiffs: (i) under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 et seq., who have incurred damages under 29

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

U.S.C. §§ 1109 and 1132(a); and (ii) under the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C, §§ 78a-78kk, and Rule 10b-5 of the Securities and Exchange Commission (the "SEC") and Section 20(a) of the Exchange Act,. § 15 U.S.C. §§ 78j and 78t and seek relief under the Exchange Act, and (iii) for state law claims.

2.    Plaintiffs bring this action for relief in their individual capacities, and on behalf of all current and former participants of the Employee Plan.

## JURISDICTION AND VENUE

3.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, 29 U.S.C. § 1132(e), and 15 U.S.C. § 78aa, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

4.    This Court has personal jurisdiction pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(1) over the Defendants, all of whom reside in the United States. This Court also has personal jurisdiction pursuant to Rule 4(k)(1)(A), Fed.R.Civ.P., because all Defendants would be subject to the jurisdiction of a court of general jurisdiction in the state of Florida.

5.    Venue is proper in this Court pursuant to 29 U.S.C. §§ 1391 and 1132(e), Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because many of the acts complained of herein occurred in substantial part in the Southern District of Florida, the Employee Plan is administered in the State of Florida, the alleged breaches of fiduciary and statutory duties occurred in this District of the State of Florida, the headquarters and principal place of business of Defendant Stiefel Laboratories, Inc. (the "Company") is in Miami-Dade County, Florida, and several of the defendants reside in the Southern District of Florida.

6.     In connection with the acts alleged in this lawsuit, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail to carry out the conduct in violation of applicable federal and state laws as set forth herein.

## THE PARTIES

### The Plaintiffs

7.     Plaintiff, James A. Bacon ("Bacon"), is a resident of Pembroke Pines, Broward County, Florida. Mr. Bacon was an employee of the Company for more than 20 years, most recently as Global Vice President for Quality Systems, and a participant in the Employee Plan. Bacon was terminated as an employee on December 9, 2008. As an Employee Plan participant, Bacon was the vested beneficial owner of common shares in the Company. Upon his termination, Bacon's stock in the Employee Plan ("Employee Plan Stock") was distributed to him and was then purchased by the Company at an artificially low price.

8.     Plaintiff, Mark Palakovich ("Palakovich"), is a resident of Winder, Georgia. Mr. Palakovich was employed by the Company from 1998 through and subsequent to April 2009, most recently as a Global Network Analyst in the Information Technology Department. Palakovich was a participant in the Employee Plan. As an Employee Plan participant, Palakovich was the vested beneficial owner of common shares in the Company. He was one of the many employees who fell victim to the Defendants' offer of a one-time "opportunity to diversify" shares in the Employee Plan. Palakovich "diversified" his shares in the Employee Plan that were purchased by the Company at an artificially low price in or about February 2009.

9.     Plaintiff, Marion Burk ("Burk"), is a resident of Miami, Florida. Ms. Burk was an employee of the Company from 1988 to April 30, 2006, most recently as assistant to the former president of international operations, Herbert Stiefel. Burk was terminated as an employee effective

May 31, 2006. As an Employee Plan participant, Burk was the vested beneficial owner of common shares in the Company. Upon her termination, Burk's stock in the Employee Plan was distributed to her and was then purchased by the Company at an artificially low price.

**The Defendants**

Stiefel Laboratories, Inc.

10.    The Company is a specialized pharmaceutical company that focuses on development and sale of dermatological and skin care products.  Formed in Europe in 1847 by John D. Stiefel, it was, at relevant times, the world's largest independent pharmaceutical company specializing in dermatology. It has annual sales of roughly one billion dollars and approximately 4,000 employees. The Company markets a variety of prescription and non-prescription products in more than 100 countries.

11.    At relevant times, the Company employed each of the Plaintiffs.  At relevant times, the Company maintained the Employee Plan and was a "party in interest" with respect to the Employee Plan as that term is defined under ERISA.

12.    Defendant, Charles W. Stiefel ("Charles Stiefel"), is a resident of Coral Gables, Miami-Dade County, Florida. At all relevant times, Charles Stiefel was a fiduciary as that term is defined under ERISA and, on information and belief, the Employee Plan Trustee. At all relevant times Charles Stiefel served as Chairman of the Board of Directors and Chief Executive Officer of the Company. Charles Stiefel was actively involved in and exercised control over the day-to-day operations of the Company. On information and belief, Charles Stiefel owns and controls, individually or through entities which he controls, more than 50% of the outstanding stock of the Company.

13.     Defendant, Brent D. Stiefel ("Brent Stiefel"), is a resident of Key Biscayne, Miami-Dade County, Florida. At relevant times, Brent Stiefel was a fiduciary as that term is defined under ERISA, a member of the Company's Board of Directors, was the Company's Executive Vice President of Corporate Development, and was actively involved in, and exercised control over the day-to-day operations of the Company. On information and belief, he is a shareholder of the Company.

14.     Defendants, Todd Stiefel, Steve Karasick and Michael Cornelius are residents of Miami, Miami-Dade County, Florida. At relevant times,

a.     Defendant Todd Stiefel was a fiduciary as that term is defined under ERISA, a member of the Company's Board of Directors, the Company's Executive Vice President of Global Strategy and was actively involved in, and exercised control over, the day-to-day operations of the Company.  On information and belief, he is a shareholder of the Company.

b.     Defendant Steve Karasick was a fiduciary as that term is defined under ERISA, the Company's Senior Vice President of People & Technology and was actively involved in, and exercised control over, the day-to-day operations of the Company.

c.     Defendant Michael Cornelius was a fiduciary as that term is defined under ERISA, the Company's Vice President and Chief Financial Officer and was actively involved in, and exercised control over, the day-to-day operations of the Company.

15.     Defendant, Lodewijk de Vink ("de Vink"), is a resident of Scottsville, Georgia. At relevant times he was a fiduciary as that term is defined under ERISA, and was a member of the Company's Board of Directors, and was actively involved in, and exercised control over, the day-to-day operations of the Company. De Vink was and is affiliated with the Blackstone Group

("Blackstone") and was designated by Blackstone to be a member of the Company's Board of Directors.  Blackstone is a shareholder of the Company.

16.     Upon information and belief, officers and directors of the Company are or have become owners of shares of Company Stock separate and apart from their beneficial ownership of shares in the Employee Plan.

17.     Defendants, Charles W. Stiefel, Matt S. Pattullo, Steve Karasick and Michael Cornelius, are persons who, in addition to the other roles they are alleged to have undertaken on behalf of the Employee Plan and/or the Company, form the "Committee" ("Committee Defendants") under the Employee Plan as described herein. They are appointed by members of the Company's Board of Directors. Upon information and belief, three individuals served on the Committee at any given time. At relevant times, each of the Committee Defendants was a fiduciary as that term is defined under ERISA.

18.     Defendant, Matt S. Pattullo ("Pattullo"), is a resident of Miami, Florida. At relevant times, he was a fiduciary as that term is defined under ERISA, the Plan Administrator of the Employee Plan and the Company's Vice President of Human Resources. He was actively involved in, and exercised control over the day-to-day operations of the Employee Plan.

19.     Defendant, Terence N. Bogush, CPA ("Bogush"), is a resident of Rhinebeck, New York. Bogush is a certified public accountant who provided the valuation appraisals of Company Stock for the Company and the Employee Plan since the mid-1980's. Since 2002 he has been a member of Bogush & Grady, LLP, a New York Limited Liability Partnership ("B&G"). Bogush provided the Company with annual valuation appraisals of Company Stock for the Company and for the Employee Plan from 2002-2006 when he was a member of B&G. On information and belief,

Bogush also provided the Company with annual valuation appraisals for 2007-2008 while a member of B&G.

20.      Defendants, Charles Stiefel, Brent Stiefel, Todd Stiefel, and de Vink are referred to collectively as the "Director Defendants."   Charles Stiefel, Brent Stiefel, and Todd Stiefel are referred to collectively as the "Stiefel Defendants."

21.      The Director Defendants were senior executive officers and directors of the Company, and were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, present and future business prospects, and matters impacting the fair market value of the Company. These Defendants had access to material information not otherwise available to employees and Employee Plan participants concerning the Company. Because of their positions with the Company, the Director Defendants had access to such information about its business, finances, financial condition, present and future business prospects, and fair market value via access to internal corporate documents, conversations and connections with other corporate officers and directors, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith that was not made known to Employee Plan participants.

22.      The Director Defendants, because of their positions with the Company and their roles as Committee members and Charles Stiefel's position as Trustee of the Employee Plan, controlled and/or possessed the authority to control the information provided to Plaintiffs and to the person who performed the annual valuation of the Employee Plan Stock. The Trustee also determined the person to be engaged by the Company to appraise the value of the Employee Plan Stock. The Director Defendants were aware, or should have been aware, of the misrepresentations *and* omissions described herein that were made to the Plaintiffs at, prior to, or shortly after such misrepresentations

or omissions, and had the ability and opportunity to prevent such misrepresentations or omissions or cause them to be corrected.

23.     The Stiefel Defendants, and particularly Charles Stiefel, because of their positions with the Company and roles as Committee and Trustee of the Employee Plan, controlled and/or possessed the authority to control the information provided to Plaintiffs and to the person who performed the annual valuation of the Employee Plan. The Stiefel Defendants were aware, or should have been aware, of the misrepresentations *and* omissions described herein that were made to the Plaintiffs at, prior to, or shortly after such misrepresentations or omissions, and had the ability and opportunity to prevent such misrepresentations or omissions or cause them to be corrected.

24.     Upon information and belief, prior to April 2009, a large majority of the issued and outstanding shares of Company Stock was owned by the Stiefel Defendants and those who are members of the families of Charles Stiefel, and before him Herbert Stiefel and Werner Stiefel (Charles' father).

## THE EMPLOYEE STOCK BONUS PLAN AND ITS VALUATION

25.     The Employee Plan was established effective April 16, 1975. Between that date and December 31, 2008, the Company made contributions of Company common stock to the Employee Plan. The plan is voluminous. Relevant parts of the Employee Plan are attached as **Exhibit A**.

26.     The Employee Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"),§ 2 et seq.,  29 U.S.C. § 1101 et seq. , and the Employee Plan documents.

27.     United States resident employees following their first eligibility year (a year with a minimum of 1,000 hours of service) are participants in the Employee Plan. Exhibit A, Plan Section 3.

28.     The Employee Plan was set up to allow Company employees to share in the growth of the Company that they had helped to create, and to be a qualified stock bonus plan under §§ 401(a) and 409 of the Internal Revenue Code (the "Code").

29.     The plan documents set forth the management of the Employee Plan, the allocation of shares of Company Stock, and the Trustees' and Plan Administrator's responsibilities.

30.     The Employee Plan is controlled and managed by, (i) a "Committee" consisting of at least three persons; (ii) a Trustee; and (iii) a Plan Administrator, all selected by the Company's directors. The Employee Plan also provides, "The exclusive responsibility and authority to control and manage the operation and administration of the Employee Plan, except to the extent such responsibility and authority are otherwise specifically (i) allocated to the Company or the Trustee, (ii) delegated to other persons by the Committee, or (iii) allocated to other parties by operation of law, shall be vested in the Committee." Exhibit A, Plan ¶ 9.1.

31.     The Employee Plan provides, "[e]ach member of the Committee shall discharge his powers and authority under the Employee Plan in good faith and in accordance with the applicable requirements of ERISA." Exhibit A, Plan ¶9.9.

32.     On information and belief, at material times, at least three of Committee Defendants Charles Stiefel, Pattullo, Karasick and Cornelius acted as the Committee.

33.     At relevant times, Charles Stiefel was the Trustee of the Employee Plan and the Committee was the Plan Administrator. Exhibit A, Plan ¶ 9.1.  On information and belief, the Committee delegated its duties as Plan Administrator to Pattullo.

34.     ERISA imposes duties upon the people and entities that are responsible for the operation of the Employee Plan. The corporate entity and individuals who operate the Employee

Plan, called "fiduciaries" of the Employee Plan, have a duty to do so prudently and for the best interests of the Employee Plan participants and beneficiaries.

35.     The Director Defendants, Committee Defendants, Charles Stiefel and Pattullo were fiduciaries with respect to the Employee Plan because they had discretionary authority or control over the management of the Employee Plan. This discretionary authority or control included, without limitation, the authority to name and retain the Employee Plan's Trustee, the Committee and Plan Administrator. They exercised this authority by naming, Charles W. Stiefel as the Trustee and naming the individuals who would serve on the Committee at any given time. They exercised discretion, authority or discretionary control respecting the management, administration or disposition of assets of the Employee Plan (i.e. the stock in the Company held by the Employee Plan ("Employee Plan Stock")) by, *inter alia*, engaging in the following conduct together with the Company:

> a.   Designating whether a contribution was being made as an ESOP Contribution or a Bonus Contribution (as those terms are defined in the Plan);
>
> b.   Sending out the correspondence dated November 21, 2008 and December 22, 2008 which urged Plaintiffs to "diversify" and sell their shares to the Company; and
>
> c.   Managing the assets of the plan (i.e. the shares in the Company) and disposed of the assets by handling the distribution to the Plaintiffs as set forth in the correspondence dated December 22, 2008.

36.     The Committee and the Director Defendants exercised discretionary authority respecting the Employee Plan's management and administration in making representations, misrepresentations and omissions to the Employee Plan participants regarding, among other things, the value of the shares in the Plan.

RM:7176263:1

37.     Participants' interests in the Employee Plan shares increased in number and value over their years of service and became vested according to the plan schedule.

38.     Until the recent merging of the Employee Plan into the Company's 401k Plan, participants in the Employee Plan could not sell, trade, redeem or otherwise dispose of their shares unless separated from the Company by retirement, death, termination or other separation. Exhibit A, Plan, Section 7.

39.     Upon distribution of the shares to a participant upon separation from service, the participant had the right to "put" the shares to the Company in accordance with the provisions of Section 7.5 of the Plan, as required for qualification of the Plan under Section 401(a) and 409(h) of the Code.  That is, the separating Employee Plan participant had the legal right to demand that the Company purchase his or her distributed shares, and the Company had the legal duty to buy them during the sixty (60) day period after the distribution of the shares to the participant and during another sixty (60) day period during the following plan year. Exhibit A, Plan ¶7.5. The Plaintiffs also had the option to not sell their shares to the Company and remain a stockholder in the Company.

40.     ERISA requires an annual valuation to be performed in good faith and based on all relevant factors for determining the fair value of securities.

41.     In order to qualify as a good faith valuation, the fair market value must be based on appraisals conducted *at least* annually. It must be conducted by a person who customarily makes such appraisals *and* who is independent of any party.[1]  26 CFR §170A-11(d)(5).

---

[1] Moreover, where the transaction is between the plan and a "disqualified person" such as the Company, value must be determined as of the date of the transaction. Treasury Reg. §54.4975-11(d)(5), CFR.

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

42.     The Trustee had the duty under the Plan to "retain an independent appraiser who meets requirements similar to those contained in regulations under section 170(a)(1) of the Code to make all valuations of [Employee Plan] Stock and/or Bonus Stock…"  Exhibit A Plan ¶ 9.7.

43.     The annual valuations performed by Bogush ("Bogush Valuations") were not in good faith because the appraisal was not performed by a person who customarily makes such appraisals and who is not independent of [the Company] under §54.4975-7(b)(9) and (12)."[2]

44.     At relevant times, Bogush was not a qualified appraiser under Code §401(a)(28)(C) because he did not, "hold himself or herself out to the public as an appraiser or perform appraisals on a regular basis." 26 CFR §170A-13 (5)(A).

45.     Further, Bogush was legally excluded and could not have been a qualified appraiser at relevant times because he was a person who "does not perform a majority of his or her appraisals made during his or her taxable year for other persons." 26 CFR §170A-13 (5)(C)(iv).

46.     The Company, its directors, the Committee and the Trustee knew, or should have known, that Bogush was legally unqualified to perform the annual appraisals.  At all relevant times each had a duty to the Employee Plan participants to ensure that Company's stock was correctly valued for purposes of ensuring that they received the fair and adequate consideration for their Company's stock required by ERISA and the Employee Plan.

47.     The Bogush Valuations consistently undervalued the Employee Plan Stock by, among other things, use of a 35% discount for lack of marketability when generally accepted valuation technique would not allow more than 5%, and other incorrect appraisal methods. At all

---

[2] These sections refer to 26 CFR §170A-11(d)(5). "For purposes of §§ 54.4975-7(b)(9) and (12) and this section, *valuations must be made in good faith* and based on all relevant factors for determining the fair market value of securities… [For transactions with non-disqualified persons] a determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to a transaction under § 54.4975-7(b)(9) and (12) will be deemed a good faith determination of value."

RM:7176263:1

material times, the Company, its directors, the Trustee, and the Committee knew that Bogush and B&G's appraisals undervalued the ESBP Stock.

48.     At no time were the Bogush or B&G appraisals delivered or made available to the Employee Plan participants although the Employee Plan required the Committee to, "furnish to each Participant or Beneficiary whatever information is required under ERISA or is otherwise appropriate to enable the participants to make whatever elections may be available pursuant to section 8."[3]  Exhibit A, Plan ¶ 9.14.

49.     Defendants based the annual valuations of the Employee Plan Stock directly upon the Bogush Valuations that they knew were invalid, performed by a legally unqualified and excluded person, and undervalued.

50.     As a direct result of the annual under-valuations, Employee Plan participants have always been short-changed by the amount of the undervaluation at the time their shares were put to the Company.

51.     The Defendants represented the valuation of Employee Plan Stock as of March 31 for the years 2004-2008 as follows:

   a.   March 31, 2008 - $16,469 per share (the "2008 Valuation")

   b.   March 31, 2007 - $14,517 per share

   c.   March 31, 2006 - $13,012 per share

   d.   March 31, 2005 - $9,170 per share

   e.   March 31, 2004 - $8,375 per share

52.     Each year, the valuation was announced by a written communication from Charles Stiefel to the Employee Plan participants. The communication represented that, "our independent

---

[3] Rules Governing Benefit Claims.

RM:7176263:1

appraisers calculate the value of the Stiefel shares owned by the Employee Plan." A copy of the November 19, 2005 letter from Charles Stiefel and December 2, 2007 e-mail to participants is attached as **Composite Exhibit D.**

53.     On information and belief, the 2008 Valuation did not take into account the discussions regarding the sale or potential sale of the Company or the nature of Blackstone's involvement as described herein. Further, on information and belief, the 2008 Valuation did not consider, or ignored, Blackstone's purchase of Company Stock in August 2007 for $500 million, or approximately $60,000 per share. Alternatively, the appraiser was not made aware of, or was misled, about the Company's intention to enter into negotiations for the sale of the Company after the Blackstone purchase of Company Stock.

54.     On November 21, 2008, the Company announced its intention to combine and merge the Employee Plan into the Company's 401(k) plan (the "November 21 Notice"). The Company informed its vested Employee Plan members that, "**for the first time ever**, you will have an annual opportunity to request **'optional diversification'** of all or a portion of **the company stock** in your Employee Plan account" (last emphasis in notice). The November 21 Notice is attached as **Exhibit B.**

55.     As stated in the November 21 Notice, once the Employee Plan and Company 401k plan merged, the Employee Plan was considered terminated as of January 1, 2009. The November 21 Notice, among other things, encourages the employees and the participants in the Employee Plan to sell their stock or interest held in the Employee Plan to the Company at the 2008 Valuation of $16,469 per share. The notice informed the holders of Employee Plan Stock interests, including Plaintiffs Bacon and Palakovich that the "optional diversification window" would be open

from February 1-March 1, 2009 to process a "diversification request" to exercise a "put" and sell their shares to the Company.

56.     Upon termination of the Employee Plan, each beneficiary was entitled to receive a distribution of Company stock. Each beneficiary had the option to hold the distributed shares of Employee Plan Stock or to sell those shares to the Company, during certain "put option periods." The first put option period was the period from February 1-March 1, 2009 and thereafter annually. The put option price for the first put option period was the price set by the 2008 Valuation of $16,469 per share.

57.     As a direct result of the annual undervaluation, Plaintiffs and Plaintiff class members were damaged by the difference between the amount of the annual valuation and the fair value of the shares that were bought by the Company or Employee Plan interests transferred pursuant to the "diversification opportunity" described above.

## THE SCHEME

58.     Throughout its 160-year history the Company has been a privately held corporation. A majority of its shares have been and are owned by Stiefel family members or entities in their control.

59.     The Company and the Stiefel family members have, until the events described herein, steadfastly asserted to the public, to their employees and to Employee Plan members that the Company was not for sale and would remain independent. Specifically, the Company consistently told Plaintiffs and Employee Plan participants, directly and through news releases that the Company would remain privately held.  For example:

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

a. On March 8, 2007 in a Miami Herald Article the Company's President, Charles Stiefel stated, "[t]he family has no plans to go public...There are so many advantages to being private;"

b. On August 10, 2007 the Company announced in a Miami Herald article that it will receive a $500 million infusion from the Blackstone Group, a New York-based asset manager. The Company "stressed that the company will remain a family-controlled business..." and denied rumors of a corporate restructuring by explaining that although, "Blackstone, like most private equity firms, often plots an exit strategy through a public offering of stock – [it is] something that Stiefel has said in the past the company has no interest in;" and

c. After the $500 million infusion from the Blackstone Group into the Company, which would be after September 2007, the Company and Charles Stiefel reiterated their mantra that the Company was independent and not for sale.

60. Indeed, the Stiefel Defendants and the Company historically asserted, privately and in various news releases that the Stiefel family would not sell the Company or take it public. It was well known among Employee Plan participants that there was no market for the Company stock and the stock paid no dividends. As such, separating Employee Plan participants generally sold their shares back to the Company when they first had the opportunity to do so.

61. In August 2007, the Company entered into an agreement with the Blackstone Group ("Blackstone") under which Blackstone invested $500 million (approximately $60,000 per share) in a then-newly issued class of preferred stock, designated as Preferred Series A, convertible at the option of the holder to Common Stock Series C at approximately a 1:1 ratio.  The agreement further

provided for a member designated by Blackstone to be elected to the Company's Board of Directors.

62.     Blackstone is an investment banking group whose *modus operandi* is to profit by "taking public" or selling the companies in which it invests. On information and belief, it was the intention of the Director Defendants and Stiefel Defendants to sell the Company and their shares in it from the time of the 2007 agreement with Blackstone.

63.     As of December 31, 2008, the following shares of Company stock were authorized, issued and outstanding:

        a.   Preferred Stock Series A – 8,277 shares (held by Blackstone); and

        b.   Common Stock Classes A, B, and C[4] – 32,812 shares.

64.     On information and belief, the Employee Plan held approximately 4,500-5,000 of the issued and outstanding shares of Common Stock Class A, Class B and Class C stock as of December 31, 2008.

65.     In or before November 2008, Blackstone, with knowledge of Charles Stiefel and the Director Defendants, began to discuss the possible sale of the Company with potential acquirers.

66.     On November 21, 2008, the Company notified its employees of the merger of the Employee Plan into the Company's 401k plan and the "opportunity to diversify" by selling their Employee Plan shares to the Company. *See* **Exhibit B**.

67.     On or about December 9, 2008, the Company terminated a number of its employees, including many senior employees. Many of those terminated were participants in the Employee Plan.

---

[4] The difference between Common Stock Classes A, B and C relates to voting rights. There is no difference in value between the shares.

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

68.     On December 22, 2008 Charles Stiefel met with the chief executive officer of a then-potential acquirer, along with a senior managing director of Blackstone and a representative of the potential acquirer's investment banking firm.

69.     On the same date, December 22, 2008, the Company again notified the Employee Plan participants of key dates for those requesting distributions. The Company informed those persons that the values to be paid for distributions requested from that date to March 16, 2009 was the "Current Share Price (March 31, 2008)" while distributions requested after March 16, 2009 would be paid after availability of the March 31, 2009 Share Price, "typically available sometime in November."  A copy of the December 22, 2008 letter is attached as **Exhibit C.**  Despite being in the process of negotiating its own sale, the Company failed to disclose the possible sale or the fact that it may impact the stock price.

70.     Although the information provided to the Employee Plan participants on and after November 21, 2008 set forth a new right of participants to sell their interest in Company Stock from within the Employee Plan, i.e., the "opportunity to diversify," the limited documents provided to the Employee Plan participants blatantly omitted any reference to the potential sale of the Company or discussions regarding such a sale, which would result in a much higher valuation of the Company Stock and likely would have caused Employee Plan participants to delay their "puts" or "diversification opportunities" to sell Employee Plan Stock to the Company.

## The GlaxoSmithKline Sale

71.     On April 24, 2009, the Company notified its shareholders of the Merger Agreement. According to the Information Statement furnished to shareholders on or about that date:

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

a. In January 2009, discussions for the acquisition of the Company had progressed to the point where five companies had indicated an interest in acquiring the Company through Blackstone, its investment banker;

b. During February 2009, the Company's management met with management teams of four of the five parties who were interested in acquiring the Company. On February 26, 2009, representatives of GlaxoSmithKline ("Glaxo") attended a presentation by the Company's management;

c. Glaxo is a public company incorporated under the laws of Great Britain. It has headquarters in London and U.S. headquarters in Research Triangle Park. It has operations in some 140 countries and products sold in over 150 countries;

d. On March 20, 2009, the Wall Street Journal reported that the Company was considering selling itself, and mentioned three potential acquirers, including Glaxo, and an estimated sale price in the range of $3 billion to $4 billion;

e. On March 24, 2009, Glaxo and another party submitted bids to acquire the Company. Those parties continued their due diligence through mid-April 2009. Drafts of proposed merger agreements were thereafter exchanged;

f. During the period April 17-19, 2009, the Company's management met with Glaxo's representatives to negotiate the final terms of a Merger Agreement; and

g. On April 19, 2009, the Company's Board of Directors met, discussed and approved the Merger Agreement with Glaxo. The Merger Agreement was signed on April 20, 2009.

**Plaintiffs Put Their Shares to the Company**

72.    Based upon the misrepresentations and omissions of the Director Defendants, Plaintiffs elected to put their shares of Company Stock and the Company purchased these shares.

But for the Stiefel Defendants' and the Director Defendants' misrepresentations and omissions, Plaintiffs would not have put their shares to the Company at that time and price.

73.    Plaintiffs received notices of the Company's annual valuation of their Employee Plan Stock in approximately November of each year for the value as of March 31 of that year.

74.    Employee Plan participants generally put their shares to the Company at the time when they became eligible to do so, unaware that the Annual Valuations were significantly understated.

75.    Upon separation from the Company, Plaintiff Bacon had rights to 25.386449 shares of Employee Plan Stock and Plaintiff Burk had rights to 14 shares of Employee Plan Stock. Those shares were then distributed to them. Plaintiff Palakovich had rights to 2.128881 shares of Employee Plan Stock. Palakovich diversified his shares by electing to put them to the Company during the diversification period.

76.    In or about November 2006, Plaintiff Burk elected to put her shares to the Company based on the 2006 valuation of $13,012 per share. At the time of that election, she was unaware that the 2006 valuation significantly understated the fair value of the Company.

77.    On December 7, 2006, the Company bought Plaintiff Burk's shares for $13,012 per share.

78.    In January 2009, based on the only information the Company provided to him, Plaintiff Bacon sold his shares to the Company based on the 2008 Valuation of $16,469 per share. At the time of that sale, he was unaware that the 2008 Valuation significantly understated the fair value of the Company. At the time he decided to do so, nobody had informed Plaintiff Bacon that the Company was in the process of offering itself for sale or that negotiations for sale were in progress.

79.    On February 13, 2009, the Company bought Plaintiff Bacon's shares for $16,469 per share, paying 20% cash and a promissory note for the balance payable over 5 years.

80.    In January 2009, based on the only information the Company provided to him, Plaintiff Palakovich "diversified" and elected to sell his shares to the Company based on the 2008 Valuation of $16,469 per share. At the time of that sale, he was unaware that the 2008 Valuation significantly understated the fair value of the Company. At the time he decided to do so, nobody had informed Plaintiff Palakovich that the Company was in the process of offering itself for sale or that negotiations for sale were in progress.

81.    In or about February 2009, the Company bought Plaintiff Palakovich's shares for $16,469 per share by depositing the money into Palakovich's account in the Employee Plan.

82.    The Defendants caused the Employee Plan participants to sell their shares of Company Stock to the Company for less than adequate consideration.

83.    The Defendants conveyed the Annual Valuations to Employee Plan participants when they knew or should have known that those valuations did not reflect the true fair value of the shares of Company Stock and without questioning the accuracy of the valuation.

84.    The Company and Director Defendants caused the termination of the Employee Plan for the purpose of (i) allowing a window for holders of Employee Plan Stock to liquidate those shares or "diversify" before learning of the impending sale of the Company; and (ii) obtaining for their benefit the value of the shares of the Company Stock formerly held by the Employee Plan upon the sale of the Company.

85.    The Company and Director Defendants terminated the employment of numerous employees in 2008 for the purpose of causing those people to put their shares to the Company at the March 31, 2008 valuation.

86.     The Director Defendants, Committee Defendants and Pattullo terminated the Employee Plan and merged it into the Company 401k plan, causing the Employee Plan participants to put or "diversify" their shares to the Company at a value significantly less than their fair value, to enable the remaining shareholders to obtain a greater portion of the proceeds from the sale of the Company.

87.     The Company and Director Defendants used the 2008 Valuation when they knew or should have known that it did not reflect the true fair value of the shares of Company Stock at March 31, 2008 and that it did not take into consideration the 2007 purchase of Company Stock by Blackstone for approximately $60,000 per share.

88.     The Defendants, other than Bogush and B&G, failed to cause a new valuation of the Employee Plan Stock when the Company purchased shares as part of the "optional diversification opportunity" as required under §54.4975-11(d)(5).

89.     The Company and Director Defendants consistently told Employee Plan participants that the Company currently was not for sale, or deliberately left them with the impression that such was the case as it had been for years, when they knew that the Company already had been approached about the sale of all of the Company Stock.

90.     The Company, Director Defendants, Committee Defendants and Pattullo failed to impose a blackout period on purchase of Employee Plan Stock by the Company until such time as they disclosed the existence of material negotiations for the sale of the Company.

91.     These foregoing acts, misrepresentations and omissions were part of a scheme by the Company, the Stiefel Defendants and Director Defendants to act in their self interest and that of Blackstone to the detriment of the Employee Plan participants.

92.     On information and belief, the Company bought approximately 4,355 shares of Classes A, B and C of common stock during the period January 1- March 31, 2009.  Most, if not all,

of such purchases by the Company were Employee Plan Stock purchased from Plaintiffs, members

of the Plaintiff Class and the Employee Plan at the March 31, 2008 valuation of $16,469 per share.

93.     As of April 20, 2009 there were 32,812 shares of Company common stock

outstanding and 8,930 shares of Series A Preferred stock outstanding. The price to be paid by Glaxo

to the Company shareholders is **$68,515.29 in cash** for each share of common stock (all Classes)

and preferred stock if the merger were to have been consummated on April 20, 2009 with up to an

additional $7,186.91 upon consummation of the merger.

## Misrepresentations and Omissions

94.     During 2008 and early 2009, the Company and the Director Defendants engaged in a

series of acts, misrepresentations, and omissions designed to obtain shares from Employee Plan

participants at less than fair value, to reduce the Employee Plan participants' interest in the

Company and to enable the Company to merge with a third party without paying adequate

consideration for the shares of the Company Stock held by the participants and the Employee Plan.

They then provided misleading and incomplete information to the Employee Plan participants prior

to their election to (i) put their distributed shares of the Company Stock to the Company, or (ii) elect

to "diversify" their interest in Company Stock in the Employee Plan, or (iii) hold their shares of the

Company Stock. These acts, misrepresentations and omissions include, without limitation:

> a. During the period November 1, 2008-March 31, 2009:

>> (1) Failing to disclose to the Employee Plan participants who were considering
>> whether to "put" or "diversify" that the Company was materially negotiating
>> for the sale of the Company after November 1, 2008;

(2) Failing to disclose to persons who had obtained distribution of Employee Plan Stock and were considering a "put" of their shares to the Company that the Company was then materially negotiating for its sale or merger; and

(3) Failing to disclose to persons who had had the opportunity to "diversify" the Company Stock in their Employee Plan accounts that the Company was then materially negotiating for its sale or merger.

b. As to the November 21, 2008 Letter (Exhibit B):

(4) Offering a "first time ever" opportunity to request "diversification" of all or a portion of the Company Stock in an Employee Plan participant's account at the most recent stock price [March 2008] while failing to disclose that such price did not represent the current fair value of the Company Stock; and

(5) Offering a "first time ever" opportunity to request "diversification" of all or a portion of the Company Stock in an Employee Plan participant's account at the most recent stock price [March 2008] while failing to disclose that the Company was then negotiating for its sale.

c. As to the December 22, 2008 Letter (Exhibit C):

(6) Notifying Employee Plan participants of "key dates" to submit an "ESBP Distribution Form" to obtain a distribution and "put" of Company Stock from their account, with price to be paid at March 31, 2008 Share Price if the Distribution Form was submitted before March 16, 2009, and price to be paid at the March 31, 2009 Share Price in November 2009 if the Distribution Form was submitted after March 16, 2009 while failing to disclose that the March 31, 2008 price did not represent the current fair value of the Company Stock; and

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

(7)    Notifying Employee Plan participants of "key dates" to submit an "ESBP Distribution Form" to obtain a distribution and "put" of Company Stock from their account, with price to be paid on February 13, 2009 or April 1, 2009 at the March 31, 2008 Share Price if the Distribution Form was submitted before March 16, 2009 and price to be paid at the March 31, 2009 Share Price in November 2009 if the Distribution Form was submitted after March 16, 2009, while failing to disclose that the Company was then negotiating for its sale.

d. As to the annual communication by Charles Stiefel, as Chairman, CEO and President of the Company, on or about December 2, 2008 (Composite Exhibit D):

(8)    Representing that the value of the Company Stock owned by the Employee Plan was less than its fair value;

(9)    Concealing the actual fair value of the Employee Plan Stock in effect at the time;

(10)    Willfully, maliciously and with reckless disregard for the rights of the Employee Plan participants failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company Stock held by the Employee Plan as of the time of the communication;

(11)    Representing that "our independent appraisers calculate the value of the Stiefel shares owned by the Employee Plan" when there was a single appraiser who was not independent as defined by law;

(12)    Concealing the "independent appraiser's" lack of qualifications;

(13)    Concealing the fact that the "independent appraiser" was not qualified under applicable law; and

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

(14)    Misrepresenting the actual fair value of the Employee Plan Stock in effect at the time Employee Plan participants who had separated from the Company elected to put their stock to the Company.

95.    Prior to November 1, 2008, the Company and the Director Defendants (and previous directors whose identities are not yet discovered), engaged in a series of acts, misrepresentations, and omissions designed to obtain shares from Employee Plan participants at less than fair value. Those acts, misrepresentations, and omissions include, without limitation:

a. Failing to disclose that the 'put" price of the shares or shares distributed to Employee Plan participants did not represent the actual fair value of the shares of the Company Stock held by the Employee Plan since the time that Bogush began doing the valuations;

b. Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company Stock held by the Employee Plan as of March 31, 2008 or at the time Employee Plan participants elected to put their shares of Company Stock to the Company; and

c. As to the annual letters by Charles Stiefel, as Chairman, CEO and President of the Company, before November 1, 2008 (Composite Exhibit D):

(1)    Representing the annual value of the Company Stock owned by the Employee Plan was less than its fair value;

(2) Concealing the actual fair value of the Employee Plan Stock in effect at the time;

(3) Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company Stock held by the Employee Plan as of the time of the letter(s);

(4) Representing that "our independent appraiser calculates the value of the Stiefel shares owned by the Employee Plan" when the appraiser was not independent as defined by law;

(5) Concealing the fact that the "independent appraiser" was not qualified as required by law; and

(6) Concealing the fact that the "independent appraiser" was excluded under applicable law.

d. On information and belief, letters similar to those included in Composite Exhibit D were sent to the Employee Plan Participants for each year Bogush performed the annual valuations.

## The Defendants' Plan Succeeds

96.     Based upon the books and records of the Company and knowledge of the Company's business, the Director Defendants knew, or should have known as of the date of the 2008 Valuation, that the fair value of the Company Stock was significantly more than $16,469 per share.

97.     The Company and the Director Defendants caused the termination of the Employee Plan and the resulting put or diversification of the Employee Plan Stock, as well as the purchase of shares of Company Stock not held by them or their family members, without disclosing the true fair value of these shares or the Company's future sale or merger.

98.     The Company and the Director Defendants utilized the 2008 Valuation to buy Plaintiffs' Employee Plan Stock, knowing that it significantly underestimated the fair value of the

Company, to effectuate the purchase of the Employee Plan Stock at a price significantly below its fair value.

99.    Upon information and belief, the actual fair value of each share of the Company stock that was held by the Employee Plan on March 31, 2008 was at least $60,000 per share.  The fair value of the Employee Plan Stock in early 2009, when Plaintiffs and the Plaintiff Class members sold their shares to the Company was at least $68,515.29.

100.    The Stiefel Defendants and other Director Defendants holding Company Stock gained over $52,046 per share or a total of $226 million by causing termination of employees holding Employee Plan Stock, termination of the Employee Plan and the subsequent purchase of those shares by the Company for less than their fair value.

101.    By virtue of the consistent undervaluation of its stock by a legally unqualified appraiser for more than 20 years, the Company has regularly bought its stock from terminated, retired or otherwise separated Employee Plan participants for less than fair value.

102.    The Director Defendants and Stiefel Defendants increased their efforts to reduce outstanding shares beginning in 2008 by terminating numerous employees and offering remaining Employee Plan participants the "optional diversification opportunity" to sell their shares to the Company at the 2008 Valuation.

103.    By virtue of the Stiefel Defendants' and Director Defendants' plan, they were able to reduce the outstanding number of Company common stock by approximately 4,355 shares. That reduction increased the value to the remaining shareholders and entities under their control, primarily the Stiefel Defendants and Blackstone, by approximately $226 million.

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

104.    As a result, Plaintiffs and the Class have been damaged by at least 35% of the value

of their shares before November 1, 2008 and at least $52,046 per share or a total of more than $226

million after that date.

105.    All conditions precedent to the liability of the Defendants have occurred or been

waived.

## CLASS ACTION ALLEGATIONS

A.    **Class Definition**

106.    Plaintiffs bring this action individually and on behalf of a class pursuant to Rule 23,

*Fed.R.Civ.P.*  The class upon whose behalf this suit is brought is defined as follows:

> **All vested participants in the Stiefel Laboratories, Inc. Employee Stock
> Ownership Plan who sold their shares or directed that the shares in
> their account in the Employee Plan be sold to Stiefel Laboratories, Inc.
> on or before March 31, 2009, not including any of the Defendants.**

107.    The class includes at least one sub-class to be defined as follows:

> **All vested participants in the Stiefel Laboratories, Inc. Employee Stock
> Ownership Plan who sold their shares or directed that the shares in
> their account in the Employee Plan be sold to Stiefel Laboratories, Inc.
> from November 1, 2008-March 31, 2009, not including any of the Defendants.**

B.    **Prerequisites under Fed. R. Civ. P. 23(a)**

108.    The identified class is so numerous that joinder of all members is impracticable.

Upon information and belief, more than 200 individual participants of the Employee Plan sold their

shares after separation from the Company or for whom the Employee Plan sold shares pursuant to a

"diversification request."

109.    There are common questions of law and fact as set forth in Paragraph 118 below.

110.    The claims of the class representatives are typical of the claims of the class as a

whole. No unique facts or circumstances exist that set apart the representatives from the class.

111.     The class representatives will fairly and adequately protect the interests of the class. Plaintiffs have retained attorneys experienced in complex class action litigation who have the resources to prosecute this case.

### C. Class action under Fed. R. Civ. P. 23(b)(1)

112.     Prosecution of separate actions by individual members of the class would create a risk of adjudication of the rights of the named Employee Plan participants and obligations of the Defendants which would be dispositive of the interests of the other Employee Plan participants not parties to the adjudications. Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications that, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

### D. Class action under Fed R. Civ. P. 23(b)(2)

113.     This cause of action may be maintained as a class action because the Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final equitable relief with respect to the class as a whole.

### E. Class action under Fed. R. Civ. P. 23(b)(3)

114.     The questions of fact and law common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other methods for the fair and efficient adjudication of the controversy.

115.     All class members allege that the Defendants, or some of the Defendants, engaged in wrongful conduct in violation of ERISA and federal securities laws.

116.     The predominating common questions of law and fact include the following:

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

a. Whether the Defendants, or some of the Defendants, caused the termination of the Employee Plan for the purpose of obtaining for their benefit the value of Company Stock held by the Employee Plan upon the sale of the Company;

b. Whether the Defendants, or some of the Defendants, failed to disclose to the Employee Plan participants that Company management either had or intended to enter into negotiations for the sale of the Company;

c. Whether the Defendants, or some of the Defendants, failed to disclose to the appraiser prior to completion of the 2008 Valuation that Company management either had or intended to enter into negotiations for the sale of the Company;

d. Whether the Defendants, or some of the Defendants, provided misleading or incomplete information or omitted information to the Employee Plan participants prior to their election to (i) sell or put their shares of Company Stock to the Company, or (ii) hold their shares of Company Stock;

e. Whether the Defendants, or some of the Defendants, caused the Employee Plan participants to sell their shares of Company Stock to the Company for less than adequate consideration;

f. Whether the Defendants, or some of the Defendants, failed to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Employee Plan Stock at the time the Employee Plan participants elected to put their shares of Employee Plan Stock to the Company or elected to "diversify";

g. Whether federal securities laws were violated by the acts of the Company and Charles Stiefel as alleged herein;

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

h. Whether statements made by, and omissions of, the Company and the Director Defendants to Plaintiffs in connection with Plaintiffs' sale of Company Stock to the Company or "diversification" misrepresented or omitted material facts regarding the sale and valuation of the Company;

i. Whether Bogush and B&G's negligence caused or contributed to Plaintiffs' sale of Employee Plan Stock below fair market value; and

j. To what extent the members of the class have sustained damages and the proper measure of damages.

117.   As pertinent to maintaining the claims herein, Defendants engaged in a common scheme with respect to all class members, involving the same breaches of fiduciary duties to all class members, and uniform misrepresentations and omissions as to all class members, causing substantially the same kinds of harm to all class members.

118.   Individual issues are few, if any, and would be far outweighed by the predominating common issues.  The facts on which damages may be calculated are subject to class or subclass proof.

119.   Class treatment is especially appropriate for ERISA, Exchange Act and Florida Securities Act claims such as those asserted by the Plaintiffs and the class.

120.   It does not appear that class members have, or would have, significant interests in controlling the prosecution of separate actions.

121.   At the time of filing this action, Plaintiffs are not aware of any other litigation concerning the controversy already begun by class members.

122.   There are numerous class members in various states as the Company has facilities in at least six states, whose employees are, or have been, participants in the Employee Plan. The

presence of numerous class members in various parts of the United States supports the desirability of concentrating litigation of their claims in this forum, which has the closest nexus with the events from which the claims arise.

123.     The class is not likely to present significant management problems. The membership of the class is readily determinable from records of the Company and the Employee Plan.  The class is not excessively numerous and the action will not involve extensive mini-trials of individual issues; the calculations of damages would be readily discernable by reference to records of the Employee Plan.

## Attorneys' Fees

124.      Plaintiffs have retained the undersigned counsel and are obligated for a reasonable attorneys' fee.

## Service on Secretaries of Labor and Treasury

125.     Contemporaneously with the filing of this Amended Complaint, Plaintiffs are serving a copy on the United States Secretary of Labor and the United States Secretary of the Treasury as required by 29 U.S.C. § 1132(h).

## COUNT 1
## BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS, COMMITTEE  DEFENDANTS AND PATTULLO
### (29 U.S.C. § 1104(a)(1)(A) and (B); ERISA Act § 404(a)(1)(A) and (B))

Plaintiffs incorporate the allegations of paragraphs 1 through 125 as if fully set forth herein.

126.     As set forth hereafter, "Fiduciary Defendants" or "Each Defendant" means Defendants other than the Company, Bogush and B&G.

127.     The Employee Plan is an employee pension benefit plan under ERISA § 3(2), 29 U.S.C. §1002(2), a defined contribution plan under 29 U.S.C. §1002(34), and an employee stock ownership plan under 29 U.S.C. § 1107(d)(6).

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

128.    The Employee Plan is subject to ERISA under ERISA § 4(a), 29 U.S.C. §1003(a).

129.    Plaintiffs are participants of the Employee Plan under ERISA § 502(a)(1)(b), 29 U.S.C. § 1132(a)(1)(b) because they are either employees in, or reasonably expected to be in, currently covered employment or who have a colorable claim to vested benefits.

130.    The Fiduciary Defendants are fiduciaries as defined under 29 U.S.C. § 1002(21) in that the Fiduciary Defendants exercised discretion, authority or discretionary control respecting the management of the Employee Plan or exercised authority or control respecting management or disposition of its assets and the Fiduciary Defendants have discretionary authority or discretionary responsibility in the administration of the Employee Plan as more particularly described above.

131.    As fiduciaries under ERISA each Fiduciary Defendant was obligated to act solely in the best interests of the Employee Plan's participants.

132.    The Fiduciary Defendants breached their duties to the participants of the plan in that the Fiduciary Defendants failed to discharge their duties with respect to the Employee Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to the participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as more specifically set forth above. *See* 29 U.S.C. § 1104(a).

133.    Plaintiffs have been damaged as a direct and proximate result of each Fiduciary Defendants' breach of fiduciary duty to act solely in the interests, and for the exclusive benefit, of the participants and the Employee Plan.

134.    The Employee Plan does not provide an administrative remedy for claims such as those brought here. Even if there were administrative remedies for these claims, Plaintiffs' attempt

to exhaust administrative remedies would be futile, the remedy inadequate, and, moreover, the Plaintiffs would be denied meaningful access to an administrative review scheme that is in place. The Employee Plan is administered by the same group of individuals that intentionally schemed to undervalue the Company's stock, willfully made misrepresentations and omissions to encourage the unknowing Plaintiffs to sell their stock to the Company at artificially low prices, and personally benefited from this wrongful scheme. Furthermore, resorting to the administrative process would be futile because the Committee does not have the ability to provide Plaintiffs with the remedy they are seeking, i.e. a revaluation of the stock in the Employee Plan.

135.    Plaintiffs are entitled to all available relief permitted under 29 U.S.C. §§ 1132(a) and 1109(a) including, but not limited to the following:

    a.  The recovery of benefits due to the participants and beneficiaries under the terms of the plan based upon the fair market value of their stock interest;

    b.  Attorneys' fees and costs as provided under ERISA 29 U.S.C § 1132(g)(1);

    c.  Prejudgment interest on all amounts; and

    d.  Such other and further relief as the Court deems appropriate.

WHEREFORE, Plaintiffs demands judgment against the Fiduciary Defendants for all relief set forth in paragraph 135 above.

## COUNT 2
## BREACH OF CO- FIDUCIARY DUTY
## AGAINST THE DIRECTOR DEFENDANTS, COMMITTEE
## DEFENDANTS AND PATTULLO
### (29 U.S.C. § 1105(a); ERISA Act § 405(a))

Plaintiffs incorporate the allegations of paragraphs 1 through 131 as if fully set forth herein.

136.    As fiduciaries under ERISA, each Fiduciary Defendant was obligated to act solely in the best interests of the Employee Plan's participants and beneficiaries and are liable for the

breaches of fiduciary responsibility of each of the other Fiduciary Defendants to the extent that they participated in the acts or omissions as specifically set forth herein, knowing that such acts or omissions were breaches of fiduciary obligations.

137.    As fiduciaries under ERISA, Fiduciary Defendants are liable for the breaches of fiduciary responsibility of each of the other Fiduciary Defendants because they had knowledge of the acts or omissions as specifically set forth herein and made no reasonable efforts under the circumstances to remedy the breaches.

138.    As a direct and proximate cause of each Fiduciary Defendant's breach of fiduciary duty to act in the best interests of the Employee Plan participants and beneficiaries, Plaintiffs received less than fair value for their Employee Plan Stock.

139.    Plaintiffs' attempt to exhaust administrative remedies would be futile, the remedy inadequate, and, moreover, the Plaintiffs are denied meaningful access to an administrative review scheme that is in place.  The Employee Plan is administered by the same group of individuals that intentionally schemed to undervalue the Company's Stock, willfully made misrepresentations and omissions to encourage the unknowing Plaintiffs to sell their stock to the Company at artificially low prices, and personally benefited from this wrongful scheme. Furthermore, resorting to the administrative process would be futile because the Committee does not have the ability to provide Plaintiffs with the remedy they are seeking, i.e. a revaluation of the stock in the Employee Plan.

140.    Plaintiffs are entitled to all available relief permitted under 29 U.S.C. §§ 1132(a) and 1109(a) including, but not limited to the following:

      a.    The recovery of benefits due to the participants and beneficiaries under the terms of the plan based upon the fair market value of their stock interest;

      b.    Attorneys' fees and costs as provided under 29 U.S.C. § 1132(g)(1);

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

    c.   Prejudgment interest on all amounts; and

    d.   Such other and further relief as the Court deems appropriate.

WHEREFORE, Plaintiffs demands judgment against the Fiduciary Defendants for all relief set forth in paragraph 140 above.

**COUNT 3**
**PROHIBITED TRANSACTION WITH PARTY IN INTEREST AGAINST DIRECTOR
DEFENDANTS, COMMITTEE DEFENDANTS, CHARLES STIEFEL AND PATTULLO**
**(29 U.S.C. § 1106(a)(1)(A); ERISA Act § 406(a)(1)(A))**

Plaintiff Palakovich incorporates the allegations of paragraphs 1 through 131 and 138-139 as if fully set forth herein.

141.    ERISA prohibits a fiduciary from entering into certain transactions on behalf of an Employee Plan which he knows or should know is a transaction with a party in interest. ERISA § 406; 29 U.S.C. § 1106(a)(1)(A), and imposes an excise tax on the disqualified person (in this case, the Company). 26 U.S.C. § 4975.

142.    At all relevant times, the Company was a party in interest in that it was the employer who sponsored and adopted the Employee Plan. 29 U.S.C. § 1002(14). It was also a "disqualified person" as defined in 29 U.S.C. § 4975.

143.    Sale of Employee Plan Stock to a party in interest is prohibited under 29 U.S.C. § 1106(a)(1)(A) in the absence of a valid exemption under 29 U.S.C. § 1108.  29 U.S.C. § 1108(e) specifically exempts from the restrictions of 29 U.S.C. § 1106 certain acquisitions or sales of employer securities by a qualified plan. The exemption under 29 U.S.C. § 1108(e) is inapplicable unless the value of the Employee Plan Stock is determined as of the date of the transaction. 29 U.S.C. § 1108(e); Treasury Reg. § 54.4975-11(d)(5).

144.    The Company Stock held in Plaintiff Palakovich's account in the Employee Plan was purchased in February 2009 based on a value determined as of March 31, 2008. There was no

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

valuation of the Company Stock as of the date of the transaction between the Employee Plan and the Company for purchase of the Company Stock in Plaintiff Palakovich's account.

145.     The transaction between the Company and the Employee Plan for the Company Stock in Plaintiff Palakovich's account was a prohibited transaction with a party in interest under 29 U.S.C. § 1106(a)(1)(A) and was not exempt.

146.     The Fiduciary Defendants, acting as fiduciaries of the Employee Plan, knew or should have known that the Employee Plan was engaging in transactions with a party in interest/disqualified person for the sale of securities. The Defendants caused such transactions to occur as to the interests of Plaintiff Palakovich and numerous others having accounts in the Employee Plan with disregard for the rights of the Employee Plan participants. They breached their fiduciary duties and acted willfully, recklessly and maliciously in causing the prohibited transactions to take place for the profit and interests of persons and entities other than Employee Plan participants.

147.     As a direct and proximate cause of the Fiduciary Defendants' actions in causing the prohibited transactions in violation of ERISA, Plaintiff Palakovich is entitled to all available relief permitted under 29 U.S.C. §§ 1132(a) and 1109(a) including, but not limited to the following:

a.   Restoration to the Employee Plan and Employee Plan participants all losses caused by the Fiduciary Defendants' breaches;

b.   Prejudgment interest on all amounts;

c.   Attorneys' fees and costs as provided under 29 U.S.C. § 1132(g)(1);

d.   Punitive damages pursuant to 29 U.S.C. §§ 1109 and 1132; and

e.   Such other and further relief as the Court deems appropriate.

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

WHEREFORE, Plaintiff Palakovich demands judgment against the Fiduciary Defendants for all relief set forth in paragraph 147 above.

## COUNT 4
## SECURITIES FRAUD AGAINST THE COMPANY AND CHARLES STIEFEL
### (15 U.S.C. §§ 78j and 78t of the Securities
### and Exchange Act of 1934 (Sections 19(b) and 20(a) and Rule 10b-5)

Plaintiffs incorporate the allegations of paragraphs 1 through 125 as if fully set forth herein.

148.    The Company and Charles Stiefel each carried out a plan, scheme, and course of conduct which was intended to and did: (a) deceive the Plaintiffs as to the fair value of their Company Stock; (b) artificially deflate the valuation of Company Stock; and (c) cause Plaintiffs to sell their Company Stock to the Company at artificially low prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Company and Charles Stiefel took the actions set forth herein.

149.    The Company and Charles Stiefel each: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Plaintiffs in an effort to maintain artificially low prices for the Company securities in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

150.    The Company and Charles Stiefel are sued as primary participants in the wrongful and illegal conduct.  Charles Stiefel is sued as a person in control of the Company under Section 20(a) of the Exchange Act.

151.    The Company and Charles Stiefel, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal material information about the Company's fair valuation of the Company Stock as more specifically set forth above.

152.    By virtue of the consistent undervaluation of the Company Stock by an unqualified appraiser for more than 20 years, the Company has regularly bought its stock from terminated, retired, otherwise separated, or Employee Plan participants that had the option to "diversify" for less than fair value.

153.    The Company and Charles Stiefel increased their efforts to reduce outstanding shares beginning in late 2008 by terminating employees and offering remaining Employee Plan participants the "optional diversification opportunity" to sell their shares to the Company at the 2008 Valuation. By virtue of the Company and Charles Stiefel's plan, they were able to reduce the outstanding number of Company Stock by approximately 4,355 shares. Said reduction increased the value to the remaining shareholders and entities' stock value by approximately $226 million.

154.    For example, the Company and Charles Stiefel made misrepresentations and omissions to the Employee Plan participants as set forth in paragraph 94 and 95 above.

As to the annual letters by Charles Stiefel, as Chairman, CEO and President of the Company, before November 1, 2008 (Composite Exhibit D):

(1)    Representing the annual value of the Company Stock owned by the Employee Plan was less than its fair value;

(2)    Concealing the actual fair value of the Employee Plan Stock in effect at the time;

(3)    Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company Stock held by the Employee Plan as of the time of the letter(s);

(4)     Representing that "our independent appraiser calculates the value of the Stiefel shares owned by the Employee Plan" when the appraiser was not independent as defined by law;

(5)     Concealing the "independent appraiser" was legally unqualified; and

(6)     Concealing the fact that the "independent appraiser" was excluded under applicable law;

As to the November 21, 2008 Letter (Exhibit B):

(7)     Offering a "first time ever" opportunity to request "diversification" of all or a portion of the Company Stock in an Employee Plan participant's account at the most recent stock price [March 2008] while failing to disclose that such price did not represent the current fair value of the Company Stock; and

(8)     Offering a "first time ever" opportunity to request "diversification" of all or a portion of the Company Stock in an Employee Plan participant's account at the most recent stock price [March 2008] while failing to disclose that the Company was then negotiating for its sale.

As to the December 22, 2008 Letter (Exhibit C):

(9)     Notifying Employee Plan participants of "key dates" to submit an "ESBP Distribution Form" to obtain a distribution and "put" of Company Stock from their account, with price to be paid at March 31, 2008 Share Price if the Distribution Form was submitted before March 16, 2009, and price to be paid at the March 31, 2009 Share Price in November 2009 if the Distribution Form was submitted after March 16, 2009 while failing to disclose that the March 31, 2008 price did not represent the current fair value of the Company Stock; and

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

(10)   Notifying Employee Plan participants of "key dates" to submit an "ESBP Distribution Form" to obtain a distribution and "put" of Company Stock from their account, with price to be paid on February 13, 2009 or April 1, 2009 at the March 31, 2008 Share Price if the Distribution Form was submitted before March 16, 2009 and price to be paid at the March 31, 2009 Share Price in November 2009 if the Distribution Form was submitted after March 16, 2009, while failing to disclose that the Company was then negotiating for its sale;

As to the annual letter by Charles Stiefel, as Chairman, CEO and President of the Company, on or about December 2, 2008 (Composite Exhibit D):

(11)   Representing the value of the Company Stock owned by the Employee Plan was less than its fair value;

(12)   Concealing the actual fair value of the Employee Plan Stock in effect at the time;

(13)   Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company Stock held by the Employee Plan as of the time of the communication;

(14)   Representing that "our independent appraisers calculate the value of the Stiefel shares owned by the Employee Plan" when there was a single appraiser who was not independent as defined by law;

(15)   Concealing that the "independent appraiser" was legally unqualified;

(16)   Concealing the fact that the "independent appraiser" was excluded under applicable law; and

RM:7176263:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

(17)    Misrepresenting the actual fair value of the Employee Plan Stock in effect at the time Employee Plan participants who had separated from the Company elected to put their stock to the Company.

155.    All of these statements and omissions were made by Charles Stiefel or the Company in written materials distributed by the Company to all Employee Plan participants.

156.    The Company and Charles Stiefel either acted with severe recklessness or with actual knowledge that the statements referenced herein were false and misleading and that the failure to disclose material facts would affect the determination by Employee Plan participants as to whether to "diversify" or put their shares to the Company.  The Company and Charles Stiefel deliberately or with severe recklessness refrained from taking those steps necessary to discover whether the misrepresentations and omissions were false or misleading.

157.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the valuation of the Company's Stock was artificially depressed. In ignorance of the fact that the securities were artificially depressed, and relying directly or indirectly on the false and misleading statements made by these Defendants, *or* upon the integrity of the Bogush Valuation(s), *or* on the absence of material information that was known to or recklessly disregarded by these Defendants, but not disclosed to the Employee Plan participants or Bogush  and B&G by these Defendants, Plaintiffs and the other members of the class sold their Employee Plan Stock to the Company at artificially low prices, thus increasing these Defendants' respective ownership percentages of the Company.  Plaintiffs were thereby damaged.

158.    At the time of these misrepresentations and omissions, Plaintiffs and other members of the class believed all statements were true and were unaware of any omissions. Had Plaintiffs and the other members of the class known of the fair value of the Company Stock, including the effect

of the Blackstone Agreement and Merger Agreement on the fair value of the Company Stock, Plaintiffs and other members of the class would not have sold their shares of Company Stock to the Company or they would not have done so at the artificially depressed price which they received.

159.    By virtue of the foregoing, the Company and Charles Stiefel have violated Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.

160.    The liability of Charles Stiefel as a control person under Section 20(a) of the Securities and Exchange Act arises from the following facts: (a) he was a high-level executive and director of the Company during all relevant times; (b) he was privy to and participated in the creation and development of the Company's internal budgets, plans, projections, and/or reports; (c) he was aware of and participated in the Company's dissemination of information to the Employee Plan participants and to Bogush & Grady, which he knew was materially false and misleading; (d) he was Chief Executive Officer and/or President of the Company and had the authority to direct the day-to-day operations of the Company; (e) he was involved in the decision to enter into the Blackstone Agreement and the Merger Agreement as more specifically described herein; and (f) the percentage and value of the Company Stock owned by Charles Stiefel, his family and entities that he controls, increased significantly as a result of the repurchase of shares of Company Stock from the Employee Plan participants.

161.    As a direct and proximate result of the wrongful conduct of the Company and Charles Stiefel, Plaintiffs and the other members of the class suffered damages in connection with their respective sales of Company Stock and are entitled to all available relief permitted under the Securities and Exchange Act including, but not limited to, the following:

a.    Awarding compensatory damages in favor of Plaintiffs and the other class members against the Company and Charles Stiefel, jointly and severally, for all

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

damages sustained as a result of these Defendants' wrongdoing, in an amount to be proven at trial, including interests thereon;

b. Awarding Plaintiffs and the other class members the reasonable costs and expenses incurred in this action; and

c. Such other and further relief as the Court deems just and proper.

162.    Plaintiffs' Certificates pursuant to §21D of the Private Securities Litigation Reform Act of 1995 are attached as **Composite Exhibit E**.

WHEREFORE, Plaintiffs demands judgment against the Company and Charles Stiefel for all relief set forth in paragraph 161 above.

## <u>COUNT 5</u>
## <u>FLORIDA SECURITIES ACT VIOLATION AGAINST DEFENDANT COMPANY</u>
### (Florida Securities Act, §517.301)

Plaintiffs incorporate the allegations of paragraphs 1 through 124 as if fully set forth herein.

163.    The Company violated the Florida Securities Act, §517.301, including one or more of the following:

a. employing a device, scheme or artifice to defraud the Plaintiffs by taking actions, more specifically set forth above, to undervalue the Company Stock and to create the false impression upon the Plaintiffs that the Company Stock was priced at a fair market value when the Plaintiffs sold the stock to the Company, and failed to provide information that would have alerted the Plaintiffs to the Company Stock's increase in value;

b. obtaining money or property by means of untrue statements of material facts or omissions of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

      c.   engaging in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the Plaintiffs.

164.    These actions were taken by the Company in connection with the Plaintiffs' sale of securities and the Company's purchase of the securities from the Plaintiffs.

165.    The Company knew or should have known that the statements referenced herein were false and misleading. They also knew or should have known that the failure to disclose material facts affecting the fair value of the Company Stock constituted the omission to state material facts necessary to make all statements to Employee Plan participants not misleading. Alternatively, the Company deliberately or recklessly refrained from taking those steps necessary to discover whether the misrepresentations or omissions were false or misleading.

166.    The Plaintiffs justifiably relied upon the statements made by the Company regarding the value of the Company Stock.

167.    The misrepresentations or omissions by the Company directly and proximately caused the Plaintiffs' actual loss.

168.    Plaintiffs are entitled to their reasonable costs and expenses incurred in this action, including attorneys' fees and costs pursuant to Florida Statutes, §517.211(6).

WHEREFORE, Plaintiffs demand judgment against Defendant, the Company, including damages, attorneys' fees, prejudgment interest, costs, and for such other and further relief as this Court deems just and proper.

### COUNT 6
### ACCOUNTANT MALPRACTICE AGAINST DEFENDANTS
### BOGUSH AND BOGUSH & GRADY LLP

Plaintiffs incorporate the allegations of paragraphs 1 through 123 as fully set forth herein.

169.     Bogush was hired by the Company from the mid-1980's to perform an annual valuation of Company Stock for the Employee Plan.  Bogush was a member of B&G from 2002-2006 and was the person who performed the appraisals and valuations during that time. Upon information and belief, Bogush performed the appraisals from 2007 through the present date, during which time he was also a member of B&G.

170.     The Bogush Valuations were relied upon by Employee Plan participants as the fair value for which they could put their Employee Plan Stock to the Company. The Bogush Valuation for 2008 was also used as the amount by which Employee Plan participants could exercise their right to "diversify."

171.     Bogush and B&G knew that the valuation that they performed was required under ERISA and that they were required to comply with ERISA and the Code.

172.     Bogush and B&G knew, or should have known, that ERISA required an appraisal by a "qualified appraiser" of the Company Stock for the Employee Plan. Bogush and B&G knew, or should have known, that they were not a "qualified appraiser" as defined by ERISA and the Code. Particularly:

    a.  The appraisal was not performed by a person who "customarily makes such appraisals and who is independent of [the Company] under §54.4975-7(b)(9) and (12);"

    b.  Bogush was not a qualified appraiser under Internal Revenue Code §401(a)(28)(C) because he did not "hold himself or herself out to the public as an appraiser or performs appraisals on a regular basis." 26 CFR §170A-13 (5)(A); and

    c.  Bogush was legally excluded and could not have been a qualified appraiser at relevant times because he was a person who "does not perform a majority of his or

RM:7176263:1

her appraisals made during his or her taxable year for other persons." 26 CFR §170A-13 (5)(C)(iv).

173.     Bogush and B&G knew that the Plaintiffs, as Employee Plan participants, relied upon their valuation of Company Stock in making the decision as to whether and when to put their stock to the Company under the Employee Plan. This is so because Bogush knew:

   a.   That his services were engaged specifically to perform the annual appraisal and valuation of Company Stock for the purpose of the Employee Plan;

   b.   That his annual valuation was that which was required for the Employee Plan under applicable ERISA and Internal Revenue Code provisions;

   c.   That the sole purpose of his annual valuation was to determine the value of the Company Stock in the Employee Plan;

   d.   That his valuation determined the amount which would be paid by the Company to Employee Plan participants in connection with the put provisions of the Employee Plan and ERISA;

   e.   That his valuation would be furnished to Employee Plan participants each year;

   f.   That the participants in the Employee Plan would rely on the Bogush Valuations to determine whether and when to put their shares to the Company.

   g.   That the Company and Employee Plan participants did, in fact, use his valuations during the 20+ years he appraised the value of Company Stock, for the purposes of determining the price for purchases of Company stock in compliance with the Employee Plan and ERISA.

174.     Bogush and B&G neglected their reasonable duty owed to the Plaintiffs by failing to adhere to generally accepted accounting practices in the valuation of companies and company stock for the purpose of an Employee Stock Bonus Plan under ERISA and the Code.

175.     Bogush and B&G's negligence was the proximate cause of the Plaintiffs' damages, which is the amount that Plaintiffs would have sold their stock to the Company but for Bogush and B&G negligence.

176.     As a result of the foregoing, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Bogush and B&G for damages, interest, costs, and for such other and further relief as this Court deems just and appropriate.

### COUNT 7
### BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS AND CHARLES STIEFEL
#### (Asserted as to Non-ERISA Fiduciary Duties)

177.     Plaintiffs incorporate the allegations of paragraphs 1 (as to state law claims), 2, 3 (as to supplemental jurisdiction), 4 (as to personal jurisdiction under Rule 4(k)(1)(A)), 5-16, 18, 20-24, 51-87 and 89- 123 as though fully set forth herein.

178.     The Director Defendants and Charles Stiefel owe an independent and additional common law fiduciary obligation to the Company's shareholders and must act in good faith and in the best interest of the shareholders. These duties are in addition to any fiduciary duties they may have had to the Employee Plan as a result of ERISA. The Company's directors cannot, either directly or indirectly, in their dealings on behalf of the shareholders or in any other transaction in which they are under a duty to guard interests of the shareholders, make any profit or acquire any personal benefit or advantage not also enjoyed by the other shareholders.

RM:7176263:1

179.    Charles Stiefel, as the majority shareholder, owes the minority shareholders a fiduciary obligation to act in good faith and in the best interest of the other shareholders. Charles Stiefel cannot, either directly or indirectly, in his dealings on behalf of the shareholders or in any other transaction in which he is under a duty to guard interests of the shareholders, make any profit or acquire any personal benefit or advantage not also enjoyed by the other shareholders.

180.    Upon their separation from the Company, or at the time they elected to "diversify" their shares, Plaintiffs received distributions of Company Stock and thereby became minority shareholders.

181.    The Plaintiffs placed their trust and confidence in the Director Defendants and Charles Stiefel when they decided to sell their Company Stock to the Company based upon their justified belief that they were receiving the fair value for such stock.

182.    The Director Defendants and Charles Stiefel breached their special relationship of trust and confidence created by their position, inside information, and ability to ensure that the Plaintiffs were able to sell their Company Stock by taking or failing to take action to ensure that the Plaintiffs received fair value for their stock when they put it to the Company. The Director Defendants and Charles Stiefel willfully and maliciously misrepresented to the Plaintiffs that they were receiving fair value for the stock. The Director Defendants and Charles Stiefel acted with reckless disregard of the Plaintiffs' rights as set forth in this Count.

183.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against the Director Defendants and Charles Stiefel for damages, punitive damages, interest, costs, together with such other and further relief as this Court deems just and proper.

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

## Request for Trial by Jury

184.    Plaintiffs request trial by jury of all claims so triable as of right.

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Plaintiffs
701 Brickell Ave., Suite 1900
Miami, Florida 33131
(305) 789-2700 Fax:  (305) 537-3955

s/ Norman S. Segall
NORMAN S. SEGALL, Florida Bar No. 158302
Norman.Segall@Ruden.com
BETH-ANN KRIMSKY, Florida Bar No. 968412
Beth-Ann.Krimsky@Ruden.com
MELISSA ALAGNA, Florida Bar No. 40555
Melissa.Alagna@Ruden.com

RM:7176263:1

**SERVICE LIST**
**Bacon v. Stiefel Laboratories, Inc., et al.**
**Case No. 09-CV-21871-KING/BANDSTRA**
**United States District Court, Southern District of Florida**

Mercer K. Clarke, Esquire
bclarke@scslawfirm.com
Clarke Silverglate & Campbell, P.A.
799 Brickell Plaza, 9th Floor
Miami, Florida 33131
Tele: (305)  377-0700
Fax: (305-377-3001

Hilarie Bass, Esquire
bassh@gtlaw.com
David A. Coulson, Esquire
coulsond@gtlaw.com
Sandra J. Millor, Esquire
millors@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Tele: (305) 579-0500
Fax: (305) 579-0717

Todd Wozniak, Esquire
wozniakt@gtlaw.com
3290 Northside Parkway, Suite 400
Atlanta, GA 30327
Tele: (678) 553-2100
Fax: (678) 553-2212
Admitted Pro Hac Vice

Deborah P. FitzGerald, Esquire
dfitzgerald@waltonlantaff.com
Walton Lantaff Schroeder & Carson, LLP
Corporate Center
110 East Broward Boulevard, Suite 2000
Ft. Lauderdale, Florida 33301
Tele: (954) 463-8456
Fax: (954) 763-6294

RM:7176263:1