# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-21 871-KING

JAMES A. BACON, MARK PALAKOVICH,
MICHAEL TELLER, TIMOTHY FINNERTY
and MARION BURK, individually and
on behalf of others similarly situated,

Plaintiffs,

vs.

STIEFEL LABORATORIES, INC., a
Delaware corporation, CHARLES W.
STIEFEL, BRENT D. STIEFEL, TODD
STIEFEL, LODEWIJK DE VINK,
STEPHEN KARASICK,
MICHAEL CORNELIUS
MATT S. PATTULLO,
ANJAN MUKHERJEE, TERENCE N.
BOGUSH, and BOGUSH & GRADY, LLP, a
New York Limited Liability Partnership.

Defendants.

_____/

## REPORT OF ALLEN FERRELL

### I.       QUALIFICATIONS

      1.       I am an economist and the Greenfield Professor of Securities Law at

Harvard Law School where I have taught since 1998.  I am also a faculty associate at the

Kennedy School of Government at Harvard, a member of the American Law Institute Project on

the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, a

research associate at the European Corporate Governance Institute, and a member of the ABA

EXHIBIT

FARRELL /

DPW    7-22-11

Task Force on Corporate Governance. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA") (the largest independent securities regulator in the United States), an executive member of the American Law School section on securities regulation, and the Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which is responsible for advising the Harvard Corporation on how to vote shares held by its endowment).

        2.      I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. My Ph.D. concerned the effects of firm financial disclosures on stock prices. I also have a B.A. and M.A. from Brown University. After law school, I clerked for Judge Silberman of the U.S. Court of Appeals for the District of Columbia and for Justice Kennedy of the Supreme Court of the United States.

        3.      I have testified before the U.S. Senate Subcommittee on Securities, Insurance and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, and the National Bureau of Economic Research. I have published articles in leading journals and have written widely in the areas of corporate governance, securities regulation and capital market regulation. Many of these articles are focused on issues arising from mergers and acquisitions and firm disclosure obligations. I have also served as an expert witness on issues in the mergers and acquisitions area. My academic work and prior testimony are summarized on my curriculum vitae, which is attached hereto as Exhibit A.

## II.    INTRODUCTION AND SUMMARY OF CONCLUSIONS

4.      Stiefel Laboratories, Inc. ("Stiefel Labs" or "the Company") is a
specialized pharmaceutical company that focuses on the development and sale of dermatological
and skin care products.  Second Amended Complaint-Class Action ("SAC"), ¶ 10.  Prior to July
2009, when all its stock was sold to an affiliate of GlaxoSmithKline ("Glaxo"), the Company
was operated as a privately held company.  Plaintiffs' Motion for Class Certification and
Memorandum of Law in Support, March 10, 2011 ("Plaintiffs' Memo"), at 5-6.

5.      The Company established the Employee Stock Bonus Plan (the
"Employee Plan", the "Plan" or the "ESBP") on April 16, 1975.  SAC, ¶ 28.  Between that date
and December 31, 2008, the Company made annual contributions of Company common stock
("Company Stock") and cash to the Employee Plan.  Id.  The ESBP provided vested participants
with certain rights, including the right to (1) take a distribution of all Company stock held in their
ESBP account upon death, disability, termination of employment, and certain other events; and
(2) annually "diversify" up to 25% of the Stiefel Labs stock held in their ESBP accounts upon
reaching age 55 and 10 years of employment with Stiefel Labs.  Defendants' Motion to Dismiss
Mark Palakovich's Claims ("Palakovich Motion") at 5.  After receiving a distribution of stock,
the participant had the right to "put" to Stiefel Labs at the most recently appraised value of the
stock held in the ESBP.  This right to put the stock to the Company was limited to two 60-day
periods, the first at the time of distribution and the second in the following Plan Year.  Id.

6.      By mid-2008, Stiefel Labs decided to merge the Plan into an existing 401k
Plan, effective October 1, 2008.  Palakovich Motion, at 8.  In November 2008, Stiefel Labs
notified its employees of the Plan merger.  Plaintiffs' Memo, at 7.  As part of the Plan merger,
the Company provided vested Employee Plan participants who were not otherwise eligible to

3

obtain distributions or put his or her shares to the Company with the annual right to sell the shares of Stiefel Labs stock in his account to the Company at the most recent appraised value of the stock. Id.; SAC, Exhibit D. According to this notice, the first such "optional diversification window" was to be opened from February 1-March 1, 2009 at the March 31, 2008 appraised valuation of $16,469 per share. In a subsequent notice, the period was moved forward such that the window would be opened to January 12-February 2, 2009. SAC, ¶ 59. On April 24, 2009, Stiefel Labs notified its shareholders that it had entered into a merger agreement with Glaxo which ultimately resulted in Glaxo purchasing from Stiefel Labs shareholders each share of the Company's common stock for approximately $68,515.29. Id., ¶¶ 77 & 101.

    7.  Plaintiffs Mark Palakovich, Michael Teller and Timothy Finnerty have requested that the Court enter an order certifying their lawsuit as a class action. Plaintiffs' Memo, at 2. Plaintiffs have requested that the Court define the relevant Classes as follows:

  a. <u>Class 1</u>

All vested participants in the Stiefel Laboratories, Inc. Employee Stock Ownership Plan who sold their shares or directed that the shares in their account in the Employee Plan be sold to Stiefel Laboratories, Inc. between August 10, 2007, and October 31, 2008, not including any of the Defendants.

  b. <u>Class 2</u>

All vested participants in the Stiefel Laboratories, Inc. Employee Stock Ownership Plan who sold their shares or directed that the shares in their account in the Employee Plan be sold to Stiefel Laboratories, Inc. between November 1, 2008, and April 20, 2009, not including any of the Defendants.

  c. <u>Class 2 – Sub Class</u> includes

All vested participants in the Stiefel Laboratories, Inc. Employee Stock Ownership Plan who were employees of Stiefel Laboratories at the time they sold their shares or directed that the shares in their account in the Employee Plan be sold to Stiefel Laboratories, Inc., from November 1, 2008 through and including April 20, 1999, not including any of the Defendants.

Id., at 2-3.  According to Plaintiffs, there are approximately 53-57 members of Class 1 and approximately 191 members of Class 2.  Plaintiffs' Memo, at 2.  Plaintiffs allege that the members of putative Class 1 collectively put 360.621 shares to the Company and that the members of putative Class 2 collectively put a total of 827.6072 shares to the Company.  Id., at 7-8.

8.  Plaintiffs allege that Defendants violated ERISA and federal securities laws by making a series of affirmative misstatements and omissions regarding the value of Stiefel Laboratories' common stock and the fact and status of the Defendants' efforts to sell the Company. Plaintiffs' Memo, at 21.

9.  Plaintiffs claim that each member of the Classes relied upon the alleged misrepresentations and omissions, and allege that had "members of the class known of the fair value of the Company Stock ... Plaintiffs and other members of the class would not have sold their shares of Company Stock to the Company...." SAC, ¶ 166.  I have been asked by Defendants to analyze this allegation from an economics perspective.  For the reasons described below, I have concluded that there is no basis in economics for assuming that every single member of putative Class 2 and the Sub Class would have retained their shares of Company Stock absent the alleged misrepresentations and omissions.  Exhibit B lists materials I have considered in connection with the preparation of this report.

### III.   THERE IS NO BASIS IN ECONOMICS FOR ASSUMING THAT ALL CLASS MEMBERS WOULD HAVE RETAINED THEIR SHARES.

10.  In the remainder of this report I describe the economics of employee holdings of Company stock and then apply this economic analysis to Plaintiffs' claims.

### A.   The Economics of Employee Holdings of Company Stock

5

11.     When participants in the Plan were provided with distribution and put rights, they had to decide whether to exercise these rights or continue to hold their shares. This decision required each participant to compare the value of the cash he or she would receive if he exercised his put rights with the private value he or she placed on the vested shares of Company stock he or she owned. Participants who exercised their rights (i.e., putative class members) must have concluded that the value of the cash proceeds they received from putting the stock distributed to them from their ESBP accounts exceeded the value to them of continuing to hold their shares.

12.     In analyzing these investment decisions, it is important to recognize that the private value to a participant of illiquid undiversified holdings of Company stock will generally be lower than the fair market value of that Company stock.[1] This follows from basic economic principles. In particular, the value of any financial asset to an individual depends on the risk, expected returns, and liquidity of that asset.[2] All else equal, an asset with higher expected returns will be more valuable than an asset with lower expected returns. Similarly, an asset with lower risk will be more valuable than an asset with higher risk, all else equal. And, a more liquid asset will be more valuable than a less liquid asset, all else equal.

---

1.  See, e.g., Lisa Meulbroek, "Company stock in pension plans: how costly is it?" 48 *Journal of Law and Economics* (October 2005), 443-474, at 443 (explaining that "[e]mployees holding company stock do not have fully diversified portfolios and are therefore exposed to firm-specific risk that could otherwise by 'diversified away'" and that "[e]xposure to greater risk without commensurately greater returns means that company stock will be worth less than its market value to employee investors") & 461 (explaining that "employees might be better off avoiding company stock even if they believe it to be undervalued in the market").
2.  See, e.g., Aswath Damodaran, *The Dark Side of Valuation: Valuing Young, Distressed, and Complex Businesses*, FT Press (2010), at 22 (explaining that "assets with high and predictable cash flows should have higher values than assets with low and volatile cash flows") & 171 ("[i]f investors have to accept large discounts on estimated value or pay high transaction costs to liquidate equity positions, they will pay less for equities today (and thus demand a larger risk premium)").

13.     The contribution of any asset to the risk of an individual's investment portfolio depends on the composition of his or her portfolio.[3]  When an individual holds a diversified portfolio, the contribution of an asset to the risk of the portfolio depends only on its systematic or non-diversifiable risk.  However, when an individual holds an asset in an undiversified portfolio, the contribution of the asset to the portfolio depends on both its systematic risk and its idiosyncratic or diversifiable risk.  For this reason, the private value of a risky asset to an investor who holds an undiversified portfolio will be lower than the market value of the same asset.  Investors are compensated for bearing systematic risk (through the promise of higher expected returns). Investors are not compensated for bearing idiosyncratic risk which can be eliminated through diversification.[4]

14.     Pharmaceutical stocks like Stiefel Labs stock are risky assets.  Exhibit C reports data concerning the volatility of pharmaceutical stock returns during the period from 2004 to 2008.  For each stock, Exhibit C reports the annualized volatility of returns, the ratio of the stock's volatility to the volatility of overall market returns (as measured by the annualized return of the Standard & Poor's 500 stock index), and the idiosyncratic risk of the stock.  The table shows that the average pharmaceutical stock is approximately 2.16 times riskier than the market as a whole.  Moreover, much of this risk (82.8 percent, on average) is idiosyncratic risk

---

3.  See, e.g., Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill Irwin, 9th edition, at 227 (explaining that "[a] stock's marginal contribution to portfolio risk is measured by its sensitivity to changes in the value of the portfolio").
4.  See, e.g., Stephen A. Ross, Randolph W. Westerfield & Bradford D. Jordan, *Fundamentals of Corporate Finance*, McGraw-Hill Irwin, 9th edition (2010), at 416, (explaining that "[b]ecause unsystematic risk can be eliminated at virtually no cost (by diversifying), there is no reward for bearing it", or "[p]ut another way, the market does not reward risks that are borne unnecessarily", and therefore "[t]he expected return on an asset depends only on that asset's systematic risk.")

(i.e., risk that can be eliminated through diversification and for which investors are not compensated).

15.      The contribution of company stock to the risk of a Plan participant's investment portfolio(s) depends on both the amount of Company stock held by a participant and on the size and composition of that participant's investment portfolio. I understand that data concerning the size and composition of participants' investment portfolios has not been produced in this case. However, Defendants have produced data concerning the amount of Company stock sold by members of the class. These data show that some participants held large blocks of Company stock, making it more likely some of these participants would not have had diversified investment portfolios. See Exhibit D.

16.      A rational employee would be willing to sell company stock at any price that exceeds his private valuation of the stock even if the sale price was less than his assessment of the fair market value of the stock. When the employee's stock holdings are undiversified, the private value of the company's stock to an employee may be substantially less than the market value of that stock (because holding the company stock exposes the employee to risk that could be diversified away by selling). A recent study has found that the private value to an employee of an undiversified portfolio of a company's stock is, on average, 42 percent less than the market value of the same company stock under reasonable assumptions as a result of the costs of lost diversification alone.[5] Employees with undiversified investment portfolios and greater than average aversion to risk would bear even greater costs.[6] This would necessarily result in a lower

---

5.  See Lisa Meulbroek, "Company stock in pension plans: how costly is it?" 48 *Journal of Law and Economics* (October 2005), 443-474. The ratio of the private value to market value depends on several factors including the volatility of the stock, the other assets held in the investor's portfolio, and the length of the holding period.
6.  Id., at 451.

private value of the stock by such participants. Other studies have shown that the wedge between private valuations and fair market valuations described above affects behavior. For example, employees generally exercise employee stock options well before those options expire, even though the proceeds that they receive from exercising their options are lower than the fair market value of the options. This further demonstrates the importance of risk and liquidity factors in individual investment decision-making.[7]

**B.      Application to Plaintiffs' Claims**

17.      Plaintiffs allege that if the Company had made "proper" disclosures, all members of the putative Class 2 and the Sub Class would have decided not to sell because they would have concluded that the put price was lower than the fair market value of their shares. But this is not obvious for several reasons.

18.      First, a participant would be willing to sell at any price that exceeded his private valuation of his shares, even if that price was lower than the fair market value of the shares. Participants' private valuations will generally be lower than the fair market value of the shares for the reasons discussed above. Moreover, participants' private valuations will vary between participants as a result of differences in their individual preferences and financial circumstances.

19.      Second, different participants might have had different assessments of the value implications of the allegedly omitted and misrepresented information. For example, some participants might have concluded that the Company's attempts to sell itself would fail because acquisition talks frequently collapse.[8] Some participants might have concluded that even if an

---

7.  See, e.g., Steven Huddart & Mark Lang, "Employee stock option exercises: an empirical analysis," 21 J. Acct & Econ. (1996) 5-43.
8.  See Pauline Wong and Noel O'Sullivan, "The Determinants and Consequences of

acquisition did occur, the eventual sales price would be lower than the appraised value of $16,469 per share or that the likely acquisition premium would not be large enough to offset the costs from continuing to hold an undiversified portfolio. And still others may have decided to sell some of their shares and hold onto others.

20.     Moreover, in assessing the value of the shares, participants presumably would take into account not just the allegedly favorable omitted and/or misrepresented information, but also all other information about the Company that was available to them concerning changes in the value of the shares after the March 31, 2008 valuation date. As I understand it, the Company's financial performance in late 2008 and into 2009 was such that it was projecting potential violations of bank loan debt covenants in the coming quarters and that the Company implemented an "austerity" plan and Reduction in Force during late 2008 that had resulted in the termination of numerous employees and that even then the Company was in danger of violating debt covenants during its next fiscal year. I also understand that, due to restrictions in its loan agreements, the Company may not have been able to fund optional diversification requests after February 2009 so that if a participant did not opt to diversify by February 2, 2009, the opportunity to diversify may not be available after that for some significant amount of time and the appraised value in the next fiscal year possibly could have been lower than the appraised value as of March 31, 2008. Presumably any disclosure that Plaintiffs contend should have been made would have included negative information as well.

---

(...continued)
    Abandoned Takeovers" 15, No. 2 Journal of Economic Surveys (2001), 145-186, at 146 (stating that the "incidence of abandoned takeovers is significant") & 169-173 (Table 2, which summarizes studies providing empirical evidence on the consequences of takeover failure). For a recent example, see "After Merger Talks Collapse, Salon Ends Search for Buyer," *The New York Times*, March 1, 2011.

21.     Finally, certain participants might have needed the money right away, and would have been unwilling to continue to hold their shares even if they had concluded that a sale at a higher value was likely to happen or that future valuations were likely to be higher.  This is particularly likely with respect to recently terminated participants because their terminations would have resulted in the loss of labor income, especially in light of the economic downturn during that time period.

_____

Allen Ferrell

11

# EXHIBIT A

**Allen Ferrell**
Harvard Law School
Cambridge, Massachusetts 02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

## CURRENT POSITIONS

*Greenfield Professor of Securities Law*, Harvard Law School

*Member*, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions

*Member*, ABA Task Force on Corporate Governance

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

## EDUCATION

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School*, J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University*, B.A. and M.A., 1992, *Magna Cum Laude*

## PREVIOUS POSITIONS

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

**COURSES TAUGHT**

*Securities Regulation*
*Regulation of Market Structure*
*Law and Finance*
*Law and Corporate Finance*
*Contracts*

**REFEREE FOR FOLLOWING JOURNALS**

*Quarterly Journal of Economics*
*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*

**TALKS**

Third Annual Structured Products Association Meeting, "Current Policy Issues Concerning Structured Products"

Annual Boston Analysts Society Meeting, "The Regulation of Structured Products"

Chairperson, Asian Exchange Conference, Singapore, "Issues Facing Asian Exchanges"

U.S. Senate Subcommittee on Securities, Insurance and Investment, "The Regulation of Cross-border Exchange Mergers"

Joint NASD/SEC Forum, "Law and Economics of Best Execution"

SEC Panel, "Econometrics of Measuring the Effects of Mandatory Disclosure"

American Enterprise Institute/Brookings Institution, "Shareholder Rights"

Brookings Institution, "Financial Innovation"

International Development Law Institute, "Corporate Law and Development"

World Bank, "Financial Market Development Indicators"

Shenzhen Stock Exchange, "Regulation of Insider Trading"

Numerous presentations at the National Bureau of Economic Research

**Papers**

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, Yale ICF Working Paper No. 09-09, *revise and resubmit at Journal of Finance*

"Forward-casting 10b-5 Damages: A Comparison to other Methods" with Atanu Saha, Working Paper (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Calculating Damages in ERISA Litigation", Working Paper (2011)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, in PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (Brookings Institution Press 2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs, and Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *forthcoming* in GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (editor Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" in REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns: Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, in BROOKINGS -- NOMURA PAPERS IN FINANCIAL SERVICES, Brookings Institution Press, 2007

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, in EXCHANGES: CHALLENGES AND IMPLICATIONS, Euromoney (2007)

"Shareholder Rights" in REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," in REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (Oxford University Press) (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

**EXPERT REPORTS INVOLVING DEPOSITION/WITNESS TESTIMONY**

*Abu Dhabi Investment Authority v. Citigroup*, Case No. 50148T 0065009 (Arbitration Proceeding), Expert Reports and Testimony on May 11, 2011

*Nacco Industries, et al. v. Applica Incorporated, et al*, Case No. 2541-N; Expert Report and deposition on December 15, 2010

*Black Horse Capital, et al. v. JP Morgan Chase Bank, et al.*, Case No. 08-12229; Expert Report and deposition on November 28, 2010

*SEC v. John Kelly*, Case No. 4612; Expert Report and deposition on May 17, 2010

*In re Schwab Corp. Securities Litigation*, Case No. 08-cv-1510, Expert Report and deposition on January 15, 2010

*In re Ticketmaster Entertainment Shareholder Litigation*, Lead Case No. BC407677, Expert Report and deposition on December 3, 2009

*In re Boston Scientific*, Civil Action No. 1:05-CV-11934, Expert Report and deposition on October 13, 2009

*In re Emulex Shareholder Litigation*, Civil Action No. 4519-VCS: Expert Report and deposition on June 30, 2009

*Selectica v. Trilogy*, Civil Action No. 4241-VCN: Trial testimony on April 30, 2009

*Selectica v. Trilogy*, Civil Action No. 4241-VCN: Expert Report and deposition on February 25, 2009

*In re Centerline Holding Company Securities Litigation*, Civil Action No. 08-CV-00505: Expert Report and deposition on December 4, 2008

*Ehrlich, Schlichtmann, v. Kerry et al.*, Civil Action No. 06-1403-BLS: Expert Report and deposition on November 7, 2008

*In Re Mutual Funds Investment Litigation: Parthasarathy v. RS Investment Management, L.P.*, Civil Action No. 04-CV-3798-JFM: Expert Report and deposition on June 24, 2008

*UnitedGlobalCom Shareholders Litigation*, Civil Action No. 1012-N: Expert Report and deposition on November 15, 2007

*Ryan, and All Others Similarly Situated v. Flowserve Corporation*, Civil Action No. 3:03-CV-1769-M: Expert Report and deposition on June 14, 2007

*Lamkin v. UBS PaineWebber, Inc. and UBS Warburg, LLC*, Civil Action No. H-02-0851: Expert Report and deposition on October 24, 2006

# EXHIBIT B

## Materials Considered

Pleadings

1. Second Amended Complaint-Class Action, District Court for the Sothern District of Florida, Civil Action No. 09-21871-CV-KING
2. Plaintiffs' Motion for Class Certification and Memorandum of Law in Support, March 10, 2011, Case No. 09-21871-KING/BANDSTRA
3. Defendants' Response in Opposition to Plaintiffs' Objections to Defendants' Exhibits in Opposition to Class Certification, Case No. 09-21871-KING/BANDSTRA
4. Defendants' Sur-Reply to Plaintiffs' Reply in Support of Plaintiffs' Motion for Class Certification, Case No. 09-21871-JLK
5. Motion for Leave to File an Amended Reply to the Motion for Class Certification [DE 193] and Supporting Memorandum, Case No. 09-21871-KING/McALILEY
6. Defendants' Response in Opposition to Plaintiffs' Motion for Leave to Amend Their Reply in Support of Class Certification, Case No. 09-CV-21871-JLK
7. Plaintiffs' Reply to Defendants' Response in Opposition to Plaintiffs' Motion for Leave to File an Amended Reply to the Motion for Class Certification, Case No. 09-21871-CIV-KING-McALILEY
8. Plaintiffs' Objections to Defendants' Exhibits in Opposition to Class Certification, Case No. 09-21871-CIV-KING/BANDSTRA
9. Defendants' Motion to Dismiss all of Mark Palakovich's Claims for Lack of Subject Matter Jurisdiction, Case No. 09-21871-KING/BANDSTRA
10. Defendants' Notice of Supplementation of Class Certification Record, Civil Action No. 09-21871-CV-KING/McALILEY


Publications

1. Steven Huddart & Mark Lang, "Employee Stock Option Exercises: An Empirical Analysis," 21 J. Acct & Econ. (1996)
2. Lisa Meulbroek, "Company stock in pension plans: how costly is it?" 48 Journal of Law and Economics (2005)
3. Pauline Wong and Noel O'Sullivan, "The Determinants and Consequences of Abandoned Takeovers" 15, No. 2 Journal of Economic Surveys (2001)
4. Richard A. Brealey, Stewart C. Myers & Franklin Allen, Principles of Corporate Finance, McGraw-Hill Irwin, 9th edition, (2008)
5. Aswath Damodaran, The Dark Side of Valuation: Valuing Young, Distressed, and Complex Businesses, FT Press (2010)
6. Stephen A. Ross, Randolph W. Westerfield & Bradford D. Jordan, Fundamentals of Corporate Finance, McGraw-Hill Irwin, 9th edition (2010)
7. "After Merger Talks Collapse, Salon Ends Search for Buyer," The New York Times, March 1, 2011

Production Documents

1. Stiefel Board of Directors Meeting Agenda (SLI-17-022119-0221670) and Meeting Minutes
2. Email from Gary Jellum to Stiefel Colleagues with attached Memo and FAQ from Jellum (SLI-1-000072-000085) (Defendants' Exhibits 13)
3. Email from Charles Stiefel to Fellow Stiefel Leaders (Defendants' Exhibit 33) (SLI-6-002641-002642)
4. Letter from Gary Jellum to Stiefel Colleagues with attached FAQ (SLI-1-00088-000092) (Defendants' Exhibit 14)
5. Email from Richard J. Mackay to Stiefel Teammates (PA0005) (Defendants' Exhibit 12)
6. Email from Gary Jellum to Stiefel Colleagues (Defendants' Exhibit 17) (SLI-1-000097-000098)
7. Letter from The Principal Financial Group to ESBP Participants with diversification packet (Defendants' Exhibit 18) (SLI-1-000111-000124)
8. Letter from Gary Jellum to ESBP Diversification Requestor (SLI-1-000125) (Defendants' Exhibit 76)
9. Letter from Gary Jellum to Diversification Requestor (SLI-1-000125) (Defendants' Exhibit 77)
10. Letter from Matt S. Pattullo to Plan Participant (MB 0019-25) (Defendants' Exhibit 29)
11. Stiefel internal document titled "Information on Your Employee Stock Bonus Plan" (MB0017-18) (Defendants' Exhibit 28)

Depositions

1. Deposition of Anjan Mukherjee
2. Deposition of Matt Pattullo
3. Deposition of Michael Cornelius
4. Deposition of James Bacon Vol. 1
5. Deposition of James Bacon Vol. 2
6. Deposition of Karl Popp
7. Deposition of Timothy Finnerty
8. Deposition of Mark Palakovich
9. Deposition of Catherina Pareto and exhibits
10. Deposition of Jeffrey Hooke and exhibits
11. Deposition of Charles Stiefel

<u>Data Sources</u>

1. CapitalIQ
2. © 201012 CRSP®, Center for Research in Security Prices.  Booth School of Business, The University of Chicago.  Used with permission.  All rights reserved.  www.crsp.chicagobooth.edu.
3. FT Interactive

# EXHIBIT C

## Risk of Pharmaceutical Company Common Stock
## 2004 - 2008

| # | Company Name [1] | Volatility of Stock Returns [2] | Ratio of Company Stock Volatility to Market Volatility [3] | Idiosyncratic Risk [4] |
|---|---|---|---|---|
| 1 | Alkermes, Inc. | 48.5% | 227.4% | 75.2% |
| 2 | Allergan Inc. | 29.6% | 138.7% | 60.7% |
| 3 | Amylin Pharmaceuticals, Inc. | 54.8% | 257.0% | 82.2% |
| 4 | Balchem Corp. | 39.8% | 186.9% | 73.2% |
| 5 | Caraco Pharmaceutical Laboratories Ltd. | 55.0% | 258.0% | 80.3% |
| 6 | Celgene Corporation | 41.6% | 195.1% | 74.3% |
| 7 | Cephalon Inc. | 29.4% | 138.1% | 85.5% |
| 8 | Cubist Pharmaceuticals Inc. | 47.4% | 222.5% | 87.7% |
| 9 | Dr. Reddy's Laboratories Ltd. | 34.6% | 162.3% | 78.8% |
| 10 | Elan Corp. plc | 77.4% | 363.3% | 94.0% |
| 11 | Endo Pharmaceuticals Holdings Inc. | 37.9% | 177.7% | 85.8% |
| 12 | Forest Laboratories Inc. | 33.4% | 156.5% | 80.1% |
| 13 | Isis Pharmaceuticals, Inc. | 58.0% | 272.0% | 83.7% |
| 14 | KV Pharmaceutical Co. | 50.9% | 238.9% | 94.9% |
| 15 | Mannatech Inc. | 64.1% | 300.7% | 90.6% |
| 16 | Medicines Co. | 44.5% | 208.7% | 84.2% |
| 17 | Medicis Pharmaceutical Corp. | 37.0% | 173.5% | 76.0% |
| 18 | Mylan, Inc. | 37.8% | 177.3% | 75.1% |
| 19 | Novo Nordisk A/S | 28.8% | 135.3% | 76.8% |
| 20 | Onyx Pharmaceuticals Inc. | 69.6% | 326.6% | 94.0% |
| 21 | Par Pharmaceutical Companies Inc. | 44.5% | 208.9% | 89.8% |
| 22 | Perrigo Co. | 31.9% | 149.6% | 80.2% |
| 23 | Regeneron Pharmaceuticals, Inc. | 59.9% | 281.1% | 78.9% |
| 24 | Salix Pharmaceuticals Ltd. | 51.8% | 243.0% | 87.7% |
| 25 | Schiff Nutrition International Inc. | 46.2% | 216.9% | 92.5% |
| 26 | Shire plc | 31.8% | 149.1% | 75.8% |
| 27 | United Therapeutics Corp. | 44.4% | 208.5% | 91.4% |
| 28 | USANA Health Sciences Inc. | 53.2% | 249.7% | 95.2% |
| 29 | Valeant Pharmaceuticals International, Inc. | 37.0% | 173.4% | 76.4% |
| 30 | Vertex Pharmaceuticals Incorporated | 53.7% | 252.1% | 82.3% |
| 31 | ViroPharma Inc. | 67.6% | 317.2% | 90.3% |
| 32 | Watson Pharmaceuticals Inc. | 28.1% | 131.8% | 75.9% |
| | Average | 45.9% | 215.6% | 82.8% |

Notes:

1  Includes all public companies with primary SIC code 2834 (Pharmaceutical Preparations) that traded on the NYSE, Nasdaq or Amex throughout the 2004 - 2008 period with 2008 revenues between $100m and $10b. Companies were identified using CapitalIQ.

2  Equals the annualized standard deviation of the company's daily stock returns. Company returns obtained from CRSP. © 201012 CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu.

3  Equals [2] divided by the annualized volatility of the returns of the Standard & Poor's 500 stock index of 21.3%. S&P 500 returns obtained from FT Interactive.

4  Equals the unexplained variation from a regression of company stock returns on the returns of the S&P 500.

# EXHIBIT D

## Participants' Sales of Stiefel Stock
## at the March 31, 2008 Appraisal Value

| # | Participant Name | Payment Issuance Date | Number of Shares Sold | Sale Proceeds[1] |
|---|---|---|---|---|
| 1 | Marsh, Arnie | 12/1/2008 | 29.0876 | $479,044 |
| 2 | Brown, Clinton | 12/3/2008 | 33.0000 | $543,477 |
| 3 | Callan, Kathleen | 12/3/2008 | 5.0000 | $82,345 |
| 4 | Davis, Kenneth | 12/3/2008 | 0.1874 | $3,086 |
| 5 | Kraker, Vera | 12/3/2008 | 8.0000 | $131,752 |
| 6 | Williams, Ken | 12/11/2008 | 1.0000 | $16,469 |
| 7 | Bartholomew, Jason | 12/3/2008 | 1.1461 | $18,875 |
| 8 | Donato, Anthony | 12/8/2008 | 1.5637 | $25,752 |
| 9 | Fedick, Matthew | 12/3/2008 | 0.8795 | $14,484 |
| 10 | Fleming, John | 12/3/2008 | 0.6378 | $10,504 |
| 11 | Powers, Elisabeth | 12/3/2008 | 0.4387 | $7,224 |
| 12 | Horonzy, Benjamin | 12/3/2008 | 0.3864 | $6,364 |
| 13 | Russo, Zachary | 12/3/2008 | 1.3219 | $21,770 |
| 14 | Singleton, Jane | 12/3/2008 | 0.8036 | $13,234 |
| 15 | Stork, Traci | 12/3/2008 | 0.0997 | $1,642 |
| 16 | Ledue, Heather | 12/29/2008 | 0.0778 | $1,282 |
| 17 | Gromek-Woods, Danuta | 1/5/2009 | 2.0002 | $32,942 |
| 18 | Rancourt, Ralph | 1/5/2009 | 4.3127 | $71,027 |
| 19 | Wilson, Noreen | 1/5/2009 | 4.8740 | $80,270 |
| 20 | Wilson, Ronald | 1/5/2009 | 5.4396 | $89,585 |
| 21 | Woods, David | 1/6/2009 | 1.8376 | $30,263 |
| 22 | Goff, Laurie | 1/9/2009 | 3.3708 | $55,513 |
| 23 | MacDonald, Bruce | 1/9/2009 | 38.2728 | $630,314 |
| 24 | Wilson, Margaret | 1/9/2009 | 8.7578 | $144,232 |
| 25 | Doyle, Jean | 1/23/2009 | 7.2283 | $119,043 |
| 26 | Gerber, Maria | 1/23/2009 | 2.3689 | $39,013 |
| 27 | Fried, Richard | 1/30/2009 | 30.7881 | $507,049 |
| 28 | Wagner, John | 2/2/2009 | 3.2817 | $54,046 |
| 29 | Popp, Karl | 2/13/2009 | 26.4183 | $435,084 |
| 30 | Bacon, James | 2/13/2009 | 25.3864 | $418,089 |
| 31 | Ballard, Samantha | 2/13/2009 | 0.8290 | $13,652 |
| 32 | Barretta, Colette | 2/13/2009 | 1.9013 | $31,312 |
| 33 | Beede, Clifford | 2/13/2009 | 19.0000 | $312,911 |
| 34 | Besenfelder, Mark | 2/13/2009 | 2.1708 | $35,751 |
| 35 | Bishop, Patrick | 2/13/2009 | 0.1538 | $2,532 |
| 36 | Bloss, Dominick | 2/13/2009 | 5.7500 | $94,697 |
| 37 | Bohland, Denise | 2/13/2009 | 5.5000 | $90,580 |
| 38 | Boyd, Kelly | 2/13/2009 | 0.0071 | $117 |
| 39 | Brandy, Marcia | 2/13/2009 | 0.3887 | $6,402 |
| 40 | Brandow, Byron | 2/13/2009 | 1.3467 | $22,178 |
| 41 | Brisson, Cecilia | 2/13/2009 | 1.3790 | $22,711 |

# Participants' Sales of Stiefel Stock
## at the March 31, 2008 Appraisal Value

| # | Participant Name | Payment Issuance Date | Number of Shares Sold | Sale Proceeds[1] |
|---|---|---|---|---|
| 42 | Bruno, Richard | 2/13/2009 | 0.1469 | $2,420 |
| 43 | Buel, Daryl | 2/13/2009 | 0.8568 | $14,111 |
| 44 | Buria, Sunilda | 2/13/2009 | 6.1680 | $101,580 |
| 45 | Cairns, Robin | 2/13/2009 | 1.2655 | $20,842 |
| 46 | Caldwell, Jasmine | 2/13/2009 | 0.1223 | $2,014 |
| 47 | Cash, Preston | 2/13/2009 | 3.2355 | $53,286 |
| 48 | Chapman, Catherine | 2/13/2009 | 0.8186 | $13,482 |
| 49 | Childress, Robyn | 2/13/2009 | 0.7233 | $11,912 |
| 50 | Ciufo, Scott | 2/13/2009 | 0.2000 | $3,294 |
| 51 | Clark, Todd | 2/13/2009 | 1.6682 | $27,473 |
| 52 | Clarke, Gordon | 12/3/2009 | 0.7078 | $11,657 |
| 53 | Cohoon, Michelle | 2/13/2009 | 0.4865 | $8,012 |
| 54 | Cummings, Andrew | 2/13/2009 | 0.3897 | $6,418 |
| 55 | Daly, Kim | 2/13/2009 | 0.1033 | $1,701 |
| 56 | Davis, Marla | 2/13/2009 | 0.0975 | $1,606 |
| 57 | Delaney, Chinell | 2/13/2009 | 0.1002 | $1,651 |
| 58 | Demarco, Robert | 2/13/2009 | 0.1300 | $2,142 |
| 59 | Diamond, Michael | 2/13/2009 | 2.5000 | $41,173 |
| 60 | Dimmick, David | 2/13/2009 | 0.2376 | $3,913 |
| 61 | Ferguson, Lori | 2/13/2009 | 0.1017 | $1,676 |
| 62 | Fernandez, Vivian | 2/13/2009 | 0.0276 | $454 |
| 63 | Finnerty, Timothy | 2/13/2009 | 28.2231 | $464,806 |
| 64 | Foland, Madeline | 2/13/2009 | 2.3609 | $38,882 |
| 65 | Franke, Kurt | 2/13/2009 | 0.9545 | $15,720 |
| 66 | Fry, Christopher | 2/13/2009 | 1.3045 | $21,484 |
| 67 | Fuchs, Jane | 2/13/2009 | 0.6588 | $10,849 |
| 68 | Gallagher, Carol | 2/13/2009 | 1.2979 | $21,375 |
| 69 | Gardner, Scott | 2/13/2009 | 1.2727 | $20,961 |
| 70 | Gates, William | 2/13/2009 | 0.9177 | $15,114 |
| 71 | Gebelein, Patricia | 2/13/2009 | 2.7428 | $45,172 |
| 72 | German, Anna | 2/13/2009 | 5.3961 | $88,868 |
| 73 | German, Colt | 2/13/2009 | 0.2646 | $4,358 |
| 74 | German, Richard | 2/13/2009 | 0.9304 | $15,323 |
| 75 | Germino, Dorothy | 2/13/2009 | 0.1550 | $2,553 |
| 76 | Goerz, Colleen | 2/13/2009 | 0.1056 | $1,739 |
| 77 | Goff, Darek | 2/13/2009 | 1.8676 | $30,757 |
| 78 | Goff, Jason | 2/13/2009 | 2.9496 | $48,577 |
| 79 | Guest, Wallace | 2/13/2009 | 1.3515 | $22,258 |
| 80 | Hall, Kimberly | 2/13/2009 | 1.8765 | $30,904 |
| 81 | Halligan, Sherry | 2/13/2009 | 3.0000 | $49,407 |
| 82 | Haskin, Lance | 2/13/2009 | 19.0000 | $312,911 |

## Participants' Sales of Stiefel Stock
## at the March 31, 2008 Appraisal Value

| # | Participant Name | Payment Issuance Date | Number of Shares Sold | Sale Proceeds[1] |
|---|---|---|---|---|
| 83 | Haynes, Wayne | 2/13/2009 | 1.5378 | $25,326 |
| 84 | Hayward, Randall | 2/13/2009 | 19.3600 | $318,840 |
| 85 | Hazelton, Wayne | 2/13/2009 | 19.0000 | $312,911 |
| 86 | Ho, Yeong | 2/13/2009 | 0.2254 | $3,713 |
| 87 | Hodges, Sharon | 2/13/2009 | 0.3851 | $6,342 |
| 88 | Hulbert, Glendon | 2/13/2009 | 13.3952 | $220,606 |
| 89 | Imp, Susan | 2/13/2009 | 1.1276 | $18,571 |
| 90 | Jacobson, Lee | 2/13/2009 | 1.0855 | $17,877 |
| 91 | Jaramillo, Bresly | 2/13/2009 | 2.1734 | $35,794 |
| 92 | Kaplinski, Daniel | 2/13/2009 | 0.1540 | $2,536 |
| 93 | Keith, James | 2/13/2009 | 1.5742 | $25,926 |
| 94 | Kelly, Elizabeth | 2/13/2009 | 0.7418 | $12,216 |
| 95 | Kenneally, Deborah | 2/13/2009 | 2.5926 | $42,698 |
| 96 | Kieffer, Vanessa | 2/13/2009 | 0.2547 | $4,194 |
| 97 | Klauda, Harry | 2/13/2009 | 19.5000 | $321,146 |
| 98 | Kludt, Amanda | 2/13/2009 | 0.0962 | $1,585 |
| 99 | Kobor, Ellen | 2/13/2009 | 1.2875 | $21,204 |
| 100 | Kolomer, Patrice | 2/13/2009 | 0.1377 | $2,268 |
| 101 | Kroth, Eric | 2/13/2009 | 4.5913 | $75,614 |
| 102 | Lacko, Brian | 2/13/2009 | 1.0000 | $16,469 |
| 103 | Lacombe, Frances | 2/13/2009 | 1.2927 | $21,290 |
| 104 | Lafave, Colleen | 2/13/2009 | 0.0136 | $225 |
| 105 | Lamb, William | 2/13/2009 | 1.7330 | $28,541 |
| 106 | Lemons, Ingrid | 2/13/2009 | 0.4686 | $7,717 |
| 107 | Leppig, Frederick | 2/13/2009 | 9.1032 | $149,921 |
| 108 | Lethco, Zachary | 2/13/2009 | 2.0000 | $32,938 |
| 109 | Liddle, James | 2/13/2009 | 0.4617 | $7,604 |
| 110 | Lorms, Jacob | 2/13/2009 | 1.1001 | $18,117 |
| 111 | Low, James | 2/13/2009 | 0.1571 | $2,588 |
| 112 | Lugo, Victor | 2/13/2009 | 0.5952 | $9,802 |
| 113 | Malsch, Wray | 2/13/2009 | 3.8235 | $62,969 |
| 114 | Mamay, Michael | 2/13/2009 | 3.9423 | $64,926 |
| 115 | Marshall, Diana | 2/13/2009 | 0.4206 | $6,927 |
| 116 | Martinolich, Michael | 2/13/2009 | 94.4198 | $1,555,000 |
| 117 | Mattice, Catherine | 2/13/2009 | 8.0000 | $131,752 |
| 118 | Mauldin, Anna | 2/13/2009 | 0.0884 | $1,455 |
| 119 | Maxwell, Crystal | 2/13/2009 | 0.2506 | $4,127 |
| 120 | McAllister, Robert | 2/13/2009 | 0.8664 | $14,268 |
| 121 | McComb, Karen | 2/13/2009 | 2.0379 | $33,562 |
| 122 | McDermith, Kristin | 2/13/2009 | 8.6564 | $142,561 |
| 123 | McGovern, Darlene | 2/13/2009 | 0.4192 | $6,903 |

## Participants' Sales of Stiefel Stock
## at the March 31, 2008 Appraisal Value

| # | Participant Name | Payment Issuance Date | Number of Shares Sold | Sale Proceeds[1] |
|---|---|---|---|---|
| 124 | Menchen, John | 2/13/2009 | 0.7600 | $12,516 |
| 125 | Miller, Jodi | 2/13/2009 | 0.1858 | $3,059 |
| 126 | Miller, Kiyoko | 2/13/2009 | 0.8059 | $13,272 |
| 127 | Molter, Kirk | 2/13/2009 | 0.0338 | $557 |
| 128 | Morales, Damarys | 2/13/2009 | 1.4526 | $23,924 |
| 129 | Mottl, Eileen | 2/13/2009 | 1.7656 | $29,078 |
| 130 | Mukherjee, Srabasti | 2/13/2009 | 0.1968 | $3,241 |
| 131 | Munoz, Tina | 2/13/2009 | 5.1464 | $84,755 |
| 132 | Myer, Darren | 2/13/2009 | 4.4147 | $72,706 |
| 133 | Nelson, Dale | 2/13/2009 | 0.8910 | $14,675 |
| 134 | Neto, Daniel | 2/13/2009 | 0.3769 | $6,206 |
| 135 | Oleksiw III, William | 2/13/2009 | 0.4186 | $6,894 |
| 136 | O'Neill, MaryAnn | 2/13/2009 | 1.4024 | $23,097 |
| 137 | Ortiz, Ismael | 2/13/2009 | 2.4000 | $39,526 |
| 138 | Palakovich, Kristie | 2/13/2009 | 1.4236 | $23,446 |
| 139 | Palakovich, Mark | 2/13/2009 | 2.1436 | $35,303 |
| 140 | Parker, Lance | 2/13/2009 | 0.7011 | $11,546 |
| 141 | Penza, Christian | 2/13/2009 | 0.1429 | $2,354 |
| 142 | Porter, Colleen | 2/13/2009 | 3.7267 | $61,375 |
| 143 | Porter, Robert | 2/13/2009 | 5.4811 | $90,269 |
| 144 | Raji, Sylberia | 2/13/2009 | 0.7122 | $11,730 |
| 145 | Rancourt, Shelly | 2/13/2009 | 1.8935 | $31,184 |
| 146 | Ray, Michael | 2/13/2009 | 0.3888 | $6,404 |
| 147 | Reck, Margareta | 2/13/2009 | 9.4574 | $155,754 |
| 148 | Reyes, Cynthia Torres | 2/13/2009 | 0.0002 | $3 |
| 149 | Romano, Glenn | 2/13/2009 | 0.1092 | $1,798 |
| 150 | Roos, Jacquelyn | 2/13/2009 | 0.0957 | $1,576 |
| 151 | Rossman, June | 2/13/2009 | 0.4127 | $6,796 |
| 152 | Scheckcton, Lana | 2/13/2009 | 0.6945 | $11,438 |
| 153 | Schreiber, Michelle | 2/13/2009 | 2.2131 | $36,447 |
| 154 | Schweppe, Evelyn | 2/13/2009 | 0.5853 | $9,640 |
| 155 | Shapiro, Lisa | 2/13/2009 | 1.0066 | $16,578 |
| 156 | Short, Arthur | 2/13/2009 | 1.2627 | $20,795 |
| 157 | Sidney, David | 2/13/2009 | 4.3511 | $71,659 |
| 158 | Silvestris, Cynthia | 2/13/2009 | 0.4307 | $7,093 |
| 159 | Smith, Patricia | 2/13/2009 | 0.0223 | $368 |
| 160 | Snyder, Carolyn | 2/13/2009 | 1.5866 | $26,130 |
| 161 | Stringer, Chris | 2/13/2009 | 0.0790 | $1,301 |
| 162 | Swaby, Nuria | 2/13/2009 | 0.1791 | $2,949 |
| 163 | Taniguchi, Ronald | 2/13/2009 | 0.1815 | $2,989 |
| 164 | Teller, Michael | 2/13/2009 | 19.0000 | $312,911 |

## Participants' Sales of Stiefel Stock
## at the March 31, 2008 Appraisal Value

| # | Participant Name | Payment Issuance Date | Number of Shares Sold | Sale Proceeds[1] |
|---|---|---|---|---|
| 165 | Thorington, Donna | 2/13/2009 | 0.8776 | $14,454 |
| 166 | Thorpe, Diane | 2/13/2009 | 0.1058 | $1,743 |
| 167 | Tidaback, Harry | 2/13/2009 | 0.6500 | $10,705 |
| 168 | True, George | 2/13/2009 | 15.0000 | $247,035 |
| 169 | Valerio, Senon | 2/13/2009 | 0.1056 | $1,739 |
| 170 | Van Schaick, Delores | 2/13/2009 | 1.6702 | $27,507 |
| 171 | VanDyke, Aaron | 2/13/2009 | 5.6674 | $93,336 |
| 172 | Vanvoorhis, Matthew | 2/13/2009 | 4.2723 | $70,360 |
| 173 | Vanwormer, Charliene | 2/13/2009 | 3.6434 | $60,003 |
| 174 | Veloz, Mayra | 2/13/2009 | 5.0000 | $82,345 |
| 175 | Wainwright, Charles | 2/13/2009 | 0.4518 | $7,440 |
| 176 | Webley, Christopher | 2/13/2009 | 0.3528 | $5,810 |
| 177 | Weed, Michael | 2/13/2009 | 0.3578 | $5,893 |
| 178 | Weeks, Catherine | 2/13/2009 | 7.0000 | $115,283 |
| 179 | Weiss, Clifford | 2/13/2009 | 15.0473 | $247,813 |
| 180 | Wescott, Jeffrey | 2/13/2009 | 0.5970 | $9,832 |
| 181 | Wilson, Byron | 2/13/2009 | 1.4349 | $23,631 |
| 182 | Wilson, David | 2/13/2009 | 43.0316 | $708,687 |
| 183 | Wrigley, Richard | 2/13/2009 | 7.0584 | $116,245 |
| 184 | Young, Franklin | 2/13/2009 | 3.8260 | $63,010 |
| 185 | Abraham, Sabra | 4/1/2009 | 0.1501 | $2,472 |
| 186 | Behunin, Paul | 4/1/2009 | 0.0966 | $1,591 |
| 187 | Bryant, Dirk | 4/1/2009 | 18.9427 | $311,968 |
| 188 | Cavanaugh, Karen | 4/1/2009 | 0.2372 | $3,906 |
| 189 | Levine, Benjamin | 4/1/2009 | 0.1148 | $1,890 |
| 190 | Palumbo, Carey | 4/1/2009 | 0.1008 | $1,660 |
| 191 | Sherman, Lauren | 4/1/2009 | 0.1026 | $1,689 |

Source: Exhibit A to Stiefel Laboratories, Inc.'s Objections and Responses to Interrogatories.

Notes:
1. Sale proceeds equals the number of shares sold multiplied by $16,469.

# THE DETERMINANTS AND CONSEQUENCES OF ABANDONED TAKEOVERS

Pauline Wong

*Warwick Business School*

Noel O'Sullivan

*The Business School, Loughborough University*

**Abstract.** Takeover activity has attracted a great deal of academic attention over the past three decades. Much of this interest has focused on the study of completed takeovers with a particular interest in seeking to understand the impact of takeover activity on the wealth of both shareholders in acquired and bidding firms. Unlike their completed counterparts, abandoned takeovers have received relatively little academic attention. This is surprising since a significant proportion of takeover bids are unsuccessful. This paper seeks to address the imbalance by providing a comprehensive survey of the takeover failure literature. The paper focuses on two aspects of the literature: First, we discuss and review the factors likely to influence takeover outcome. Second, we examine the consequences of takeover abandonment from the perspective of targets and bidders. We also identify a number of areas where future research may seek to improve further our understanding of the causes and consequences of takeover abandonment.

**Keywords.** Abandoned takeovers; Market for corporate control; Corporate governance

## 1. Introduction

The fundamental debate amongst analysts of the market for corporate control concerns the economic and social impact of takeovers. Two opposing schools of thought are prevalent, depending on whether the managerial or neoclassical theory of the firm is embraced. The managerial theory argues that as the separation of ownership and control facilitates managerial discretion, takeovers allow managers to increase their power and influence at shareholders' expense (Marris, 1964). Advocates of the neoclassical theory of the firm view takeovers as essential transactions for channelling corporate assets to higher-value uses (Jensen, 1986). Theoretically, a number of non-mutually exclusive sources may be responsible for an improvement in corporate efficiency subsequent to takeover — operating or financial synergies (Chatterjee, 1986), replacement of inefficient

0950-0804/01/02 0145–42      JOURNAL OF ECONOMIC SURVEYS Vol. 15, No. 2
© Blackwell Publishers Ltd. 2001, 108 Cowley Rd., Oxford OX4 1JF, UK and 350 Main St., Malden, MA 02148, USA.

unsuccessful. In a study of the outcome of UK bids in the period 1980–89, Holl and Kyriazis (1996) estimate that the probability of a friendly bid succeeding is 0.958 compared to a probability of 0.609 for the success of a bid opposed by target management. In a study of hostile takeovers only, Sudarsanam (1995) finds that between 1983–89, 47% of targets in contested bids retain their independence. In the period 1989–93, O'Sullivan and Wong (1999) report that 45% of hostile targets successfully resist a bid.

It is clear therefore that the reaction of target management is a key determinant of the success or failure of a takeover bid. Ruback (1988) notes that managerial resistance to takeovers can occur either before or after a bid: pre-bid resistance involves managerial action taken in anticipation of a bid — commonly involving the adoption of one or a combination of defensive measures, while post-bid resistance involves action taken after a bid has been launched. Sudarsanam (1991) outlines fifteen possible post-bid defences including; search for white knight bidder, declaring higher dividends, revaluation of properties, brands and intangibles, and lobbying regulatory authorities for bid referral. In a subsequent study Sudarsanam (1995) provides an empirical insight into the impact of specific defensive mechanisms on the outcome of takeover bids resisted by management. Sudarsanam (1995) finds that friendly shareholders, white knights, support of the unions and litigation increase the chances of a successful defence. Furthermore, Sudarsanam (1995) finds that divestments and advertising make a successful defence less likely. Sudarsanam (1995) suggests that divestments and advertising may be perceived by target shareholders as an admission of failure on the part of target management. In a further analysis of the impact of bid defences on takeover outcome, Holl and Kyriazis (1997) note that most types of ex-post bid defences reduce the probability of takeover success. Holl and Kyriazis (1997) estimate that the probability of bid success for hostile bids varies between 0.42 (use of law) to 0.64 (corporate restructuring).

Target management resistance has been interpreted in two opposing ways in the literature — it may suggest either manager-shareholder alignment or management entrenchment. In the former case, target management acts in the interests of target shareholders and consequently opposes a bid in order to maximise shareholder welfare during the takeover process. For example, managerial resistance may set in motion an auctioning process whose effect is to bid up the share price whether the bid is successful or not. Alternatively, target management acts to prevent the takeover bid from succeeding though it may be in the interests of the target's shareholders. For example, managerial resistance may increase bidding costs substantially and thereby decrease the probability that a takeover attempt will be successful. Earlier studies of target management's resistance to takeovers suggested that defensive action served to reduce shareholder wealth (e.g. Dodd, 1980; DeAngelo and Rice, 1983; Malatesta and Walkling, 1988). However, a number of recent studies suggest that the adoption of defensive measures may actually increase shareholder wealth (e.g. Linn and McConnell, 1983; Comment and Schwert, 1995; Franks and Mayer, 1996; Holl and Kyriazis, 1997). Holl and Kyriazis (1997) find that the use of ex-post defensive measures by target managers

relinquished after a takeover. Thus, the decision of incumbent managers to accept or reject a takeover bid is likely to depend on the trade-off between the potential wealth gains of share ownership and possible losses of compensation, prestige and security following post-acquisition displacement. Baron (1983) suggests that target managers' preference for retaining control during a takeover may be influenced by the level of their share ownership in the firm. When personal financial gain, as a consequence of substantial managerial equity holdings, arising from a change of ownership are non-trivial and are likely to outweigh possible losses, incumbent managers are less likely to want to oppose a takeover attempt. Mikkelson and Partch (1989) also argue that high levels of managerial ownership may encourage takeover activity if bidders incur lower transaction costs when negotiating with a smaller group of large shareholders compared to dealing with a large group of small shareholders. In a counter theory, Stultz (1988) develops a model that demonstrates how high levels of managerial ownership may reduce the likelihood that a takeover bid will succeed. Stultz (1988) argues that high managerial ownership may discourage takeover attempts by raising premiums to such a prohibitive level that takeovers become unprofitable transactions for bidders. In this way entrenched managers may be capable of frustrating the takeover market and thereby successfully resist unwelcome offers.

In recent years the influence of managerial ownership on managerial reaction and the eventual outcome of takeover bids has received a great deal of empirical attention. Overall, the evidence suggests that managerial ownership does play an important role in both management's reaction to and the ultimate outcome of takeover bids. For the purposes of the present review it is interesting to examine the findings of empirical studies on the role of managerial ownership at two stages of takeover activity: managerial reaction and bid outcome. Both O'Sullivan and Wong (1998b) in the UK and Song and Walkling (1993) in the US find that managerial ownership is significantly lower in hostile targets compared to friendly targets (O'Sullivan and Wong, 1998b report mean values of 1.78% and 9.89% in the UK while Song and Walkling (1993) report mean values of 6.4% and 13.3% for the US). Similar results are reported for the UK by Holl and Kyriayis (1997), and for the US by Raad and Ryan (1995), Bucholtz and Ribbens (1994), Cotter and Zenner (1994) and Walkling and Long, (1984). These findings support the contention that low levels of managerial ownership serve to hinder takeovers while the potential for takeover premiums for managers means that friendly takeovers are associated with higher levels of managerial ownership. Since this evidence suggests that hostile takeovers only occur when managers possess low levels of ownership, a possible implication is that economically desirable takeovers are not attempted because bidders believe that managers possess sufficient equity either to hinder the bid's success or make the takeover price uneconomic for the bidder. On the other hand, the finding of larger levels of managerial shareholding in targets of friendly takeovers suggests that bidders are unlikely to launch a bid in the absence of prior agreement with target management.

In respect of bid outcome, O'Sullivan and Wong (1998b) find that higher levels of managerial ownership increases the likelihood of takeover success. Similar

© Blackwell Publishers Ltd. 2001

and Pickering (1988), successful bidders in their sample are larger, more liquid, more highly geared and have faster growth rates than their abandoned counterparts. Holl and Pickering (1988) suggest this finding may be indicative of managers in unsuccessful bidders being motivated by growth rather than profitability. In contrast, Taffler and Holl (1991) found that bidders involved in unsuccessful acquisitions displayed weaker pre-bid performance. Analysing share-price data, Limmack (1991) found that both successful and unsuccessful bidders showed positive abnormal returns prior to the bid announcement. In light of his findings Limmack (1991) argues that there is little evidence to substantiate the notion that unsuccessful bidders are necessarily weaker than bidders who have successfully completed a takeover. Indeed, Limmack's results support similar findings for the US reported by Dodd and Ruback (1977).

The notion that abandoned mergers are more likely to occur when the pre-bid performance of targets are strong relative to their bidders has been investigated by two UK studies. For comparison purposes, Holl and Pickering (1988) carried out an analysis of the relative performance of targets and their bidders for both successful and unsuccessful takeovers. In the case of successful acquisitions, bidders were found to be, on average, larger, more liquid, faster growing and had higher returns on equity. However, these successful bidders had lower gearing and lower return on capital employed compared to their targets. In contrast, bidders involved in unsuccessful takeovers had higher returns on capital employed relative to their targets but no significant pre-bid differences on other measures. Taffler and Holl's (1991) study provides some support for the hypothesis that bidders involved in unsuccessful acquisitions are financially weaker than their targets suggesting that such bids are undertaken for growth rather than profitability reasons. In the case of successful acquisitions, Taffler and Holl (1991) fail to find any evidence that financially strong companies acquire financially weaker companies in an effort to improve the performance of the bidder.

This section has discussed a number of factors expected to influence the outcome of takeover bids. The most important impediment to bid success is the reaction of management in the target firm. Management hostility towards a bid reduces the likelihood of a successful bid from around 95% to around 50%. In seeking to understand why target management oppose certain bids and welcome others, we explored a number of factors likely to influence management's attitude. First, we consider the governance of the target in order to examine whether weak shareholder control facilitates entrenched managers to pursue their own interests at shareholders' expense. We find evidence that independently constituted boards are more likely to pursue shareholder interests in the takeover process since takeover-related decisions by independent boards serve to increase shareholder wealth. Even though we fail to find any consensus on the impact of concentrated ownership on managerial behaviour, a number of studies have identified a valuable monitoring role for institutional/unaffiliated shareholders in seeking to pursue shareholder interests during takeover activity. Interestingly, both independent boards and institutional/unaffiliated shareholders seek to maximise shareholder wealth by resisting takeovers. A potentially important distinction

© Blackwell Publishers Ltd. 2001